Cecilia TOMNEY, Plaintiff,

v.

INTERNATIONAL CENTER FOR THE DISABLED and Local 815, International Brotherhood of Teamsters, Defendants.

No. 02 Civ. 2461(DC).

United States District Court, S.D. New York.

Feb. 25, 2005.

---

Bartlett Law Group LLC, by Randall D. Bartlett, Esq., New York, NY, for Plaintiff.

Jackson Lewis LLP, by Elizabeth Cowit, Esq., Lori Bauer, Esq., New York, NY, for Defendant ICD.

Wiseman & Hoffmann, by Andrew S. Hoffmann, Esq., New York, NY, for Defendant Local 815 IBT.

## OPINION

CHIN, District Judge.

In this employment case, plaintiff Cecilia Tomney sues her former employer for breach of a collective bargaining agreement (the "CBA"), unpaid overtime wages under the Fair Labor Standards Act (the "FLSA"), unlawful discrimination because of her age and disability, and unlawful retaliation. Plaintiff also sues her union for breach of its duty of fair representation ("DFR"). Defendants International Center for the Disabled ("ICD") and Local 815, International Brotherhood of Teamsters ("Local 815" or the "Union"), move for summary judgment dismissing all claims. Plaintiff cross-moves for partial summary judgment on the FLSA claims. For the reasons discussed below, ICD's motion is granted in part and denied in part, and the Union's motion is granted. Plaintiff's cross-motion is denied.

## BACKGROUND

### A. *The Facts*

Construed in the light most favorable to plaintiff, the facts are as follows:

Tomney worked at ICD as a vocational rehabilitation counselor from June 1992 until she was fired on December 6, 2000. (ICD's 56.1 Statement ¶¶ 1, 2, 13).[1] ICD

---

**1.** Where one party's 56.1 Statement is cited, the other side has not disputed the facts al- leged, unless otherwise indicated.

is a not-for-profit organization that assists individuals with disabilities in job placement, counseling, and other life-enhancing programs. (Livingston Dep. at 9–13; Harrison Aff. ¶¶ 2–4). ICD employs approximately 200 individuals. (Bartlett Decl. Ex. 7). Individuals, or "consumers," as they are called at ICD, are referred to ICD from agencies that contract with ICD, and through court system work release programs. (ICD's 56.1 Statement ¶ 36; Harrison Aff. ¶ 6).

Tomney was 49 years old when she was fired, and is legally blind from macular degeneration, a condition she has had since childhood. (Bartlett Decl. Exs. 7, 14; Tomney Dep. at 413–17). During Tomney's tenure at ICD, she was a member of Local 815 and became a shop steward on March 7, 2000. (Local 815's 56.1 Statement ¶ 3; Tomney Decl. ¶ 1).

### 1. *Tomney's Duties*

ICD requires that vocational rehabilitation counselors possess a masters degree in rehabilitation counseling or in a related field such as social or human services counseling. (2d Harrison Aff. ¶ 2). ICD also requires that vocational rehabilitation counselors have two years experience in vocational rehabilitation counseling or in a related field such as social or work placement service. (*Id.*).

Tomney has a masters degree in rehabilitation counseling, and is also certified by the Commission of Rehabilitation Counselors in Chicago, Illinois, as a rehabilitation counselor. (Tomney Dep. at 356, 385; ICD's 56.1 Statement ¶¶ 2, 25). As a vocational rehabilitation counselor at ICD, Tomney (1) provided vocational counseling and case management to ICD consumers, (2) conducted consumer intakes, and (3) prepared consumer intake forms, assessments, and progress reports. (*Id.* ¶ 3).

Tomney described her duties as maintaining

> close contact with the vocational [instructors] who did the teaching, who spent the whole day with the client. And they would—the instructor would bring to my attention any problems they were having with the client that required me to intervene with counseling. . . . I would see for counseling anybody that required it or that a teacher asked me to see. And I provided counseling and all the paperwork that goes along with how the client was doing in the program.

(Tomney Dep. at 325–26). Tomney's counseling sessions generally concerned topics such as general workplace obligations and adapting to a workplace environment. (ICD's 56.1 Statement ¶¶ 4, 5). Tomney had the authority to refer consumers for other social work services, therapy, or additional counseling within ICD. (Tomney Dep. at 361). For Tomney to refer a consumer to an outside agency, she was required to receive approval from her supervisor and the sponsoring agency.[2] (ICD's 56.1 Statement ¶ 8; Pl.'s 56.1 Resp. Statement ¶ 8).

### 2. *Tomney's First Five Years at ICD*

From the time Tomney was hired in 1992 until July 1997, she worked in the training unit within the vocational services department. (ICD's 56.1 Statement ¶¶ 28, 29, 42). A consumer enrolled at ICD was assigned to either the training unit, the vocational improvement program ("VIP"), or another external program. (*Id.*). If a consumer was placed in the training program, that consumer would attend classes teaching clerical, mail room, or direct care skills. (*Id.* ¶ 33). The VIP program was a "special needs" program designed for

---

**2.** ICD's vocational programs are primarily funded by the Vocational Educational Ser-

vices for Individuals with Disabilities ("VE-SID"). (*See* ICD's 56.1 Statement ¶¶ 36–37).

those consumers who were not ready for the classes in the training unit. (*Id.* ¶ 34). Prior to July 1997, each counselor specialized in the evaluation, training, or VIP unit. (Tomney Dep. at 327). Tomney specialized in the training unit. (*Id.*).

In July 1997, the vocational services department was reorganized so that a counselor, such as Tomney, would be assigned a consumer, and would stay with the consumer through the evaluation and eventual placement in the VIP unit, training unit, or external programs as applicable. (*Id.* at 327–28). During this time, all of the counselors' case loads increased. (*Id.* at 333–34; ICD's 56.1 Statement ¶¶ 39–41).

### 3. *Tomney's Workload Continues to Increase*

In or about September 1999, the vocational services department again restructured to address an increase in case loads. (Tomney Dep. at 331–32). At that time, Tomney requested that she be allowed to return to concentrating in the training unit. (*Id.* at 332–34). Her supervisor at the time, Linda Moriber, "got angry" with Tomney and denied her request. (*Id.* at 333–34). Moriber instead required Tomney to assist in both the training and VIP unit. (*Id.*).

During this time period, many employees at ICD complained to management about their increased case loads. (ICD's 56.1 Statement ¶¶ 43–46). For example, by memorandum dated August 18, 2000, fourteen vocational services department staff employees complained about the "high volume of clients" to the director of vocational services, Maria Jacobson. (*Id.* ¶ 45).

During this period of time, management at ICD believed that the vocational services department had the capacity to take on more consumers. (*Id.* ¶ 46; Pl.'s Resp. 56.1 Statement ¶ 46). Tomney and other employees at ICD believed their workloads

were too heavy. (Tomney Dep. at 529–30, 627–28; ICD's 56.1 Statement ¶¶ 43–46). Tomney's caseload increased from 40 to 65 consumers between April and December 2000. (Tomney Dep. at 758).

It was during this time period that Tomney alleges she worked overtime. Tomney claims she worked overtime "whenever her case load exceeded 35 consumers." (*Id.* at 760). Between April and December 2000, Tomney worked overtime every week, although she has no documentation showing what specific hours she worked during that time period. (*Id.* at 758–59). ICD did not pay Tomney overtime compensation. (*Id.* at 725–26). ICD maintains records of Tomney's hours that indicate that every day Tomney started at 9:00 a.m. and stopped work at 5:00 p.m. (Cowit Aff. Ex. N). These time sheets are signed by Tomney or a secretary on her behalf. (*Id.*).

### 4. *ICD's Accommodation of Tomney's Disability*

From the date of Tomney's hire until April 1999, ICD accommodated her disability by assigning a secretary to assist her in various aspects of her job. (ICD's 56.1 Statement ¶¶ 57–63; Tomney Dep. at 495). In addition, from 1997 through Tomney's discharge in December 2000, ICD assigned a reader to assist her during the intake process by helping her conduct the interview, complete the forms, and ask the consumer questions. (*Id.* ¶¶ 55–61). Tomney also received assistance in reading attendance sheets that were posted on the VIP bulletin board. (Tomney Dep. at 448, 529).

ICD also accommodated Tomney by not requiring her to travel downtown to the Veterans Administration Hospital (the "VA") to evaluate and counsel consumers. (ICD's 56.1 Statement ¶ 63). While generally counselors did travel to the VA as part of their job, Tomney asked that she not to

be assigned this task because her visual impairment made it more difficult for her to travel. ICD granted the request. (*Id.*).

### 5. Tomney's Allegations of Disability Discrimination

In April 1999, ICD hired Linda Moriber as chief operating officer. (Tomney Aff. ¶ 10). Tomney described Moriber's behavior toward ICD employees as "aggressive, loud, and intimidating." (Tomney Dep. at 631–32). Moriber's treatment of ICD employees was discussed during collective bargaining negotiations. (*Id.*). Moriber was not as accommodating to Tomney's disabilities as her previous supervisors, and as a result Tomney's workload increased. (Tomney Aff. ¶ 11). For example, in September 1999, Moriber required Tomney to cover for other staff members who were sick or on vacation. (*Id.*). Prior to Moriber's hire, Tomney had not been asked to cover for other staff members. (*Id.*). When Tomney explained to Moriber that she needed more time than others to complete her duties because of her disability, Moriber responded: "if it takes you three times as long, there is something wrong with the way you are working . . . . If you want to continue working for this organization, then you will not ask me to revisit this issue." (*Id.*). Over time, Tomney was repeatedly asked to take on more work and cover for other employees. (*Id.* ¶ 12).

In another incident in January 2000, Moriber stated to a group of ICD employees, including Tomney and another legally blind employee, that "the auditors would have to be blind and brain dead not to notice what disgusting shape the charts are in." (*Id.* ¶ 15).

In August 2000, Tomney requested overtime pay as an accommodation for her disability when she stayed late to conduct two consumer intake interviews. (Tomney Dep. at 507). Harrison denied her request. (*Id.*). According to Tomney, this accommodation was necessary because she "would [not] have had to stay quite as late if I had the vision to do the work faster." (*Id.*).

In November 2000, ICD denied Tomney's request that she be assigned a secretary to make follow-up telephone calls to consumers assigned to her. (*Id.* at 500–02). According to Tomney, it was difficult to track attendance because "it [is] visual to go over all those attendance sheets." (*Id.* at 501). Previously, Tomney was given priority to use an ICD secretary, but after Moriber's arrival, other counselors utilized much of the secretary's time, making it difficult for her to assist Tomney. (*Id.* at 426–30, 500–01).

### 6. The Events Surrounding Tomney's First Dismissal

Three incidents purportedly led to Tomney's first discharge. First, on October 26, 2000, Tomney met with Jacobson and Moriber concerning a consumer complaint against her and the consumer's request to change counselors. (Tomney Dep. at 533, 536–37). Tomney had recommended to the consumer that she take a "leave of absence" from the VIP program "because [the consumer] was obviously unhappy there and she would have a week to seek personal counseling and just think about what she wanted to do." (*Id.* at 536). The consumer agreed with Tomney's recommendation, in part because Tomney was going to be on vacation during the consumer's absence. (*Id.*). After this meeting, the consumer complained to her case manager, Marie Champagne, who worked at Unique People Services, one of ICD's clients. (Jacobson Dep. at 59–60; ICD's 56.1 Statement ¶ 64). Champagne contacted ICD concerning Tomney's recommendation that the consumer's treatment at ICD be interrupted. (Tomney Dep. at

536; ICD's 56.1 Statement ¶ 64). This eventually led to a meeting with Tomney, Jacobson, and Moriber. (ICD's 56.1 Statement ¶ 67). During this meeting, however, Moriber telephoned Champagne and placed the call on speaker phone. (*Id.* ¶ 68). Champagne stated that her consumer did not understand why she was being asked to leave ICD's program, and was "deeply upset" about the situation. (*Id.* ¶ 69). Moriber explained to Champagne that ICD's policy was not to interrupt the treatment of a consumer who needed support, and invited the consumer to return to ICD and be assigned a different counselor. (*Id.* ¶ 70).

After the conference call, Tomney, Jacobson, and Moriber further discussed the matter. (*Id.* ¶ 73). Tomney was "angry" and accused Moriber of "taking sides" with Champagne during the conference call. (Tomney Dep. at 549–50, 557–58). Tomney stated to Moriber that "it would have been nice if you had shown me some support to someone from an outside agency." (Tomney Dep. at 549). Tomney then stated that she was "starting to feel sick from the way [Moriber was] acting now," and asked Moriber if she could "come back another time." (*Id.* at 561). Moriber kept "browbeating" Tomney, and Tomney made the following statement: "Norma [Walker] just had a stroke and a heart attack. That [is] on my mind. I [do not] want to be the next one to have it."[3] (*Id.*). After Tomney's statement, Moriber was "speechless," and Moriber then asked Tomney if she was accusing Moriber of causing Walker to have a heart attack. Tomney responded that she was "not saying that you were the cause, I[am] saying that this kind of stress is very, very, hurtful to people in the workplace and I, myself, am starting to feel sick because of it." (*Id.* at 562). Following

this exchange, Jacobson asked Maggie Harrison, director of human resources at ICD, to come to Moriber's office, and Tomney was suspended with pay for the remainder of the day while ICD investigated the situation. (ICD's 56.1 Statement ¶ 81). The following day, Tomney received a "final warning" from ICD, that stated, *inter alia,* that:

> This action is being taken in response to an incident that occurred between you and Linda Moriber, chief operating officer, and Maria Jacobson. . . . When you were prevailed upon to go to [Moriber's] office with [Jacobson], [Moriber] attempted to review the matter with you in a businesslike manner. In response, you took a loud and angry tone and accused [Moriber] of being the cause of a stroke and heart attack suffered by a 63–year–old supervisor last week. . . . This incident would have justified your immediate termination. However, we have given you the benefit of the doubt and opted for counseling over termination. . . . Any recurrence of unacceptable conduct will result in your immediate termination.

(Cowit Aff. Ex. O). Tomney refused to sign the letter because she disagreed with the characterization of events at the meeting with Moriber and Jacobson as described in the letter. (*Id.*).

The second incident occurred in November 2000. ICD received a complaint from Phoenix House, a residential treatment center that contracts with ICD, that ICD had not informed it of a patient who had failed to attend court-mandated programs at ICD for several weeks. (ICD's 56.1 Statement ¶ 88). In April 1999, Moriber instituted a policy requiring counselors to track attendance of consumers. (Tomney

---

**3.** Norma Walker was Tomney's supervisor from the time Tomney was hired until October 2000, when she suffered a stroke while at work and took disability leave from ICD. (Tomney Dep. at 325).

Dep. at 500–03). Tomney had been assigned to serve as the patient's vocational counselor. (ICD's 56.1 Statement ¶ 89). On November 10, 2000, Moriber, Jacobson, Harrison, Tomney, and Tom Carolan, a shop steward, met to discuss the Phoenix House complaint. (*Id.* ¶ 91). At the meeting, Moriber told Tomney that it was her responsibility to track new intakes and monitor the attendance of consumers assigned to her. (*Id.* ¶ 93). Tomney disputed that she was responsible for monitoring the patients' attendance. (*Id.* ¶ 95). Tomney claimed that either a "teacher" or another coordinator was responsible for monitoring patient's attendance. (*Id.*). Tomney also stated at this meeting that the monitoring of attendance, "no shows," tardiness, and "regular feedback, daily feedback," should be assigned to other ICD employees. (*Id.* ¶ 98; Pl.'s 56.1 Resp. Statement ¶ 97). Following this meeting, no changes were made by either ICD or Tomney concerning Tomney's responsibilities. (Jacobson Dep. at 156).

The third incident occurred on December 4, 2000, when Tomney met again with Moriber about complaints by two of Tomney's consumers. (ICD's 56.1 Statement ¶¶ 102–04). The complaints concerned two consumers assigned to ICD from VESID. (*Id.* ¶ 102) The consumers had been assigned to Tomney but had received no contact from ICD, even though they had been enrolled at ICD for three weeks. (*Id.* ¶¶ 102–03). At the December 4, 2000 meeting to discuss the VESID complaints, Jacobson claims that Tomney "raised her voice" and "shook her finger" at Jacobson. (Jacobson Dep. at 80). Tomney claims she did not raise her voice and did not point her finger during the meeting. (Tomney Dep. at 609–10). Tomney did not accept responsibility for failing to monitor the two consumers. (ICD's 56.1 Statement ¶ 108). Rather, Tomney accused an ICD coordinator, Joan Capello, of encouraging Phoenix House and VESID to write complaints to

ICD about her. (Tomney Dep. at 610–11). Jacobson considered Tomney's behavior at this meeting as interfering with her ability to provide constructive feedback to Tomney and as constituting insubordination. (ICD's 56.1 Statement ¶ 110).

On December 6, 2000, Tomney was fired from ICD. (Tomney Dep. at 617). Harrison informed Tomney that she was fired "because of the arguments you had on Monday with Maria Jacobson." (*Id.*). At the meeting when Tomney was fired, ICD provided her with a letter setting forth the reasons for her dismissal. (ICD's 56.1 Statement ¶ 113). The letter stated, *inter alia*, that:

> On December 4, 2000, Maria Jacobson ... attempted to discuss with you two recent irregularities in the provision of consumer services. Your response was not professional, as you raised your voice, stood over Ms. Jacobson shaking your finger at her, and left the meeting without listening to Ms. Jacobson or resolving the issue. Therefore, pursuant to the October 27, 2000 memo, ICD is terminating your employment effective immediately.

(Cowit Ex. S). The Union grieved the discharge, and the grievance was denied. (Tomney Dep. at 15). The Union then submitted the discharge to arbitration. (*Id.*).

### 6. *Tomney's Supplemental Termination*

In September 2001, during the course of Tomney's arbitration, Tomney met with counsel for the Union and provided certain documents. (ICD's 56.1 Statement ¶ 118). The Union, in turn, provided the documents to ICD, pursuant to an ICD document request. (*Id.*). These documents included copies of twelve pages from ICD's files on a consumer enrolled at ICD. (*Id.* ¶ 119). The documents consisted of highly

confidential and personal information concerning the consumer's medical history, anxiety, depression, and substance abuse. (*Id.*). Tomney kept this consumer's files at her home even after she was no longer assigned to work with the consumer and after she was fired from ICD. (*Id.* ¶ 120).

Tomney kept the consumer's files at her home because (1) she believed she would be successful in her arbitration, she would be reinstated to ICD, and the consumer would be reassigned to her, and (2) the files were "absolutely essential for [her] arbitration" because the consumer "would be discussed at the arbitration and this was the only way [she] had to prove that [her] story was truthful." (*Id.* ¶ 121). Tomney did not request permission from ICD or the consumer to maintain copies of the files at her home. (*Id.* ¶¶ 123–24).

Upon learning at the arbitration hearing that Tomney kept the confidential consumer files at her house, Jacobson and Harrison were "shocked" and believed Tomney's unauthorized retention of the files violated ICD's confidentiality policies. (*Id.* ¶¶ 125–26). Accordingly, on September 25, 2001, ICD issued a supplemental termination notice to Tomney, informing her that she was discharged for removing confidential documents concerning a consumer from ICD's premises and failing to return them even after the consumer was no longer assigned to her, and after Tomney no longer worked at ICD. (*Id.* ¶ 127; Cowit Aff. Ex. U). Tomney grieved her second termination. (*Id.* ¶ 128). This grievance was denied and was not submitted to arbitration. (*Id.* ¶ 129).

### 7. *The Results of The Arbitration*

On March 8, 2002, the arbitrator rendered his award with respect to the first grievance, finding that the ICD acted too harshly by firing Tomney, and that termination was not appropriate "progressive discipline" as set out by the CBA. (Award at 5). The Award found "no question" that Tomney was guilty of "unprofessional" conduct that was "unacceptable." (Award at 4). The Award ordered Tomney reinstated, but without back pay. (*Id.* at 7). ICD did not reinstate Tomney because the supplemental dismissal was based on separate and distinct grounds from those in the arbitrator's Award. (ICD's 56.1 Statement ¶ 133). The arbitrator did not address the supplemental dismissal of Tomney, noting in the Award that he did not have jurisdiction over the supplemental dismissal. (Award at 3).

### 8. *Tomney's EEOC Filings*

In or about July 2001, Tomney filed a charge of discrimination with the EEOC alleging that ICD discriminated against her based on her disability in violation of the American with Disabilities Act (the "ADA") when it discharged her in December 2000. (ICD's 56.1 Statement ¶ 134). The EEOC served a copy of this charge on ICD, and ICD contested Tomney's allegations in a submission to the EEOC. (*Id.* ¶ 135).

On November 20, 2001, Tomney filed an amended charge of discrimination with the EEOC adding age discrimination and allegations of retaliation against Tomney for filing her first EEOC complaint in July 2001. (*Id.* ¶ 136). The EEOC never served a copy of the amended EEOC complaint on ICD, and ICD did not respond to the amended complaint. (*Id.* ¶ 137). On March 5, 2003, the EEOC issued a determination finding "reasonable cause" that ICD violated the Age Discrimination in Employment Act (the "ADEA") and retaliated against Tomney for filing her first EEOC complaint. (*Id.* ¶ 138). ICD did not learn of Tomney's amended EEOC complaint until they received the "reasonable cause" determination from the EEOC. (*Id.* ¶ 139).

### 9. Tomney's Relationship and Representation By Local 815

Local 815 is the labor union that represents the employees at ICD. (Local 815's 56.1 Statement ¶ 1). George Miranda, the CEO of Local 815, has the authority and responsibility for determining whether to pursue arbitration over unresolved grievances. (*Id.* ¶ 2). A CBA governed the terms of Tomney's employment. (*Id.* ¶ 3).

#### a. The Arbitration of Tomney's First Dismissal

Following Tomney's dismissal in December 2000, Local 815 promptly investigated ICD's decision and pursued the grievance to arbitration. (Local 815's 56.1 Statement ¶ 6). Local 815 represented Tomney in the arbitration. (*Id.* ¶ 7).

In early January 2001, prior to the scheduled start of the arbitration, Miranda unsuccessfully attempted to contact Tomney on several occasions to prepare her testimony. (Miranda Aff. ¶¶ 19–20). On January 17, 2001, two days before the arbitration was to begin, counsel for the Union contacted Miranda and stated that he was "uncomfortable" proceeding with the arbitration because he had not spoken with Tomney. (*Id.* ¶ 20). Miranda authorized counsel to seek an adjournment, and the arbitration was rescheduled for June 29, 2001. (*Id.* ¶¶ 20–22). Tomney, for her part, claims that she was inadequately prepared for her arbitration. (Tomney Dep. at 19).

Prior to the start of the June arbitration proceedings, Tomney retained a private attorney, Linda Bartlett, to represent her interests in the proceedings. (*Id.* ¶ 23). The Union's policy concerning private attorneys allowed them to be present, but not participate, during arbitration proceedings. (*Id.* ¶ 24). The Union counsel informed Tomney's attorney of this policy, and invited her to assist in preparing for the arbitration and to attend the arbitration. (*Id.*).

During the arbitration, counsel for the Union called as a witness Carolan, the shop steward who witnessed the meeting that led to Tomney's termination. (Miranda Aff. ¶ 9). Tomney alleges that the Union should have called a number of character witnesses, in addition to Carolan, to testify at the arbitration. (Tomney Dep. at 17). Tomney also testified, and was allowed to identify other witnesses she wished to present and she made an offer of proof as to what she expected each of them to testify to. (Miranda Aff. ¶ 10). ICD called several witnesses, including Harrison and Jacobson, each of whom was cross-examined by the Union counsel. (*Id.* ¶ 11). Tomney alleges that the Union did not adequately cross-examine Harrison and Jacobson, and also that the Union attorneys "socializ[ed]" with ICD during the proceedings. (Tomney Dep. at 19, 62–63).

In the Union's summation, counsel argued that the events leading to Tomney's dismissal did not constitute insubordination; her *Weingarden* rights were violated because she did not have a shop steward present at certain meetings with management; and Tomney was a victim of harassment by management. (Local 815's 56.1 Statement ¶ 13). Union counsel also argued that Tomney should be reinstated to her former position with back pay. (*Id.* ¶ 13). On or about March 8, 2002, the arbitrator issued an award sustaining Tomney's grievance, finding that she had not been discharged for cause, and ordered her reinstated to her former position without back pay. (*Id.* ¶ 14).

#### b. The Grievance of Tomney's Supplemental Dismissal

On May 31, 2001, ICD's attorneys served the Union with a demand for infor-

mation. (Miranda Aff. ¶ 26). The ICD demand requested, *inter alia,* that Tomney provide all documents supporting her claim of wrongful discharge against ICD. (*Id.*). This document request was sent to Tomney and to her attorney, with a request that they produce responsive documents. (Local 815's 56.1 Statement ¶ 16).

On September 17, 2001, Tomney's husband delivered a package of documents to Local 815's attorneys. (*Id.* ¶ 17). On September 20, 2001, the Union's attorney produced some of the documents provided to him by Tomney's husband in response to the information demand. (*Id.* ¶ 18). The documents included the confidential files of a consumer at ICD and led to Tomney's supplemental dismissal. (*Id.* ¶ 18, Cowit Aff. Ex. U).

Local 815 encouraged Tomney to file a grievance following the supplemental dismissal. (Local 815's 56.1 Statement ¶ 21). Local 815 investigated Tomney's grievance, and on October 26, 2001, the Union represented Tomney at a grievance hearing. (*Id.* ¶ 22, 23). At the grievance hearing, Tomney indicated that she was aware of ICD's confidentiality policy, but believed she had been authorized to remove copies of consumer files from ICD. (*Id.* ¶ 23). Tomney was given an opportunity to speak at the hearing, and did not identify any supervisors who had authorized her to remove the confidential documents, nor did she identify any other employees who had engaged in similar conduct but were not disciplined.[4] (*Id.* ¶ 23).

After the grievance hearing and a complete investigation, Miranda determined that Tomney's grievance concerning the supplemental termination was not meritorious and that there was no substantial likelihood that it would be successful if presented to an arbitrator. (*Id.* ¶ 24). The

Union notified Tomney of Miranda's decision, and thereafter Tomney wrote a letter to Miranda claiming that there were certain "facts omitted" from the letter from the Union. (*Id.* ¶ 24–25). Miranda invited Tomney to provide him with any additional information for the Union to consider, but Tomney did not respond to Miranda's invitation. (*Id.* ¶ 26).

**B. Prior Proceedings**

Tomney filed a complaint in this action on March 29, 2002. On March 31, 2003, Tomney filed an amended complaint, within 90 days of receiving a determination of reasonable cause and a right to sue letter from the EEOC. The amended complaint asserts eleven claims against ICD and one claim against Local 815. Specifically, plaintiff alleges that ICD (1) breached her employment contract, (2) violated the FLSA, (3) violated the ADA, (4) violated the ADEA, (5) violated the ADEA's prohibition against retaliation, and (6) violated New York State human rights laws prohibiting discrimination based on disability, age, and unlawful retaliation. (Am. Compl.¶¶ 38–57, 104–91). Plaintiff alleges that Local 815 Breached its duty of fair representation ("DFR"). (*Id.* ¶¶ 58–103).

On October 21 and 22, 2002, respectively, ICF and Local 815 filed motions to dismiss the complaint. While the motions were pending, Tomney filed her amended complaint. The motions to dismiss were denied by memorandum decision dated April 28, 2003. The parties engaged in discovery and on June 9 and 14, 2004, respectively, ICF and Local 815 filed the instant motions for summary judgment. On June 23, 2004, Tomney filed her cross-motion for partial summary judgment. For the reasons that follow, ICF motion is

---

4. Tomney claims that she did not identify other employees who had taken documents home because "she did not want them to be fired like [she] was." (Tomney Dep. at 125–26).

granted in part and denied in part; Local 815's motion dismissing the claims against it is granted; and Tomney's cross-motion is denied.

## DISCUSSION

I first address Tomney's claims against the Union, and then her claims against ICD.

### I. *Tomney's Claim Against Local 815*

#### A. *Applicable Law*

■ "A union, of course, has a duty to represent fairly all employees subject to the collective bargaining agreement." *Spellacy v. Airline Pilots Ass'n–Int'l,* 156 F.3d 120, 126 (2d Cir.1998). This duty "derives 'from the union's statutory role as exclusive bargaining agent.' " *Agosto v. Corr. Officers Benevolent Ass'n,* 107 F.Supp.2d 294, 303 (S.D.N.Y.2000) (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 74, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991)).

■ A DFR claim requires a plaintiff to first show conduct that violates one of the three components of the duty, which requires that the union act (1) to " 'serve the interests of all members without hostility or discrimination toward any, [ (2) ] to exercise its discretion with complete good faith and honesty, and [ (3) ] to avoid arbitrary conduct.' " *O'Neill,* 499 U.S. at 76, 111 S.Ct. 1127 (quoting *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967)). Second, the plaintiff must show causation, that is, that the union's conduct " 'seriously undermine[d] the arbitral process.' " *Barr v. United Parcel Serv., Inc.,* 868 F.2d 36, 43 (2d Cir.1989) (alteration in original) (citations omitted).

■ Courts have fleshed out the three components of the DFR. The discrimination component refers to that which is "invidious" or "unlawful." *O'Neill,* 499 U.S. at 81, 111 S.Ct. 1127. To show bad faith, there must be "fraud, deceitful action or dishonest conduct." *Amalgamated Ass'n of St., Elec., Ry. & Motor Coach Employees v. Lockridge,* 403 U.S. 274, 299, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971). Lastly, the actions of a union "are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *O'Neill,* 499 U.S. at 67, 111 S.Ct. 1127 (citations omitted). In the grievance context, "[t]actical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach." *Barr,* 868 F.2d at 43. Although "a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion," there is no "absolute right to have [a] grievance taken to arbitration." *Spellacy,* 156 F.3d at 128 (citations omitted).

■ As Tomney brings claims pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 et seq., against ICD for breach of the CBA and the Union for breach of the duty of fair representation, her claim is a "hybrid § 301/fair representation" action. *Hussein v. Pierre Hotel,* No. 99 Civ. 2715(DC), 2000 WL 776920, at \*2 (S.D.N.Y. June 14, 2000). A plaintiff may sue the union or the employer, or both, but in any case must allege violations on the part of both. *See DelCostello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 165, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); *Carrion v. Enterprise Ass'n, Metal Trades Branch Local Union 638,* 227 F.3d 29, 34 (2d Cir.2000).

#### B. *Application*

Tomney complains that the Union violated its DFR by ineffectively representing her in the arbitration following her first discharge and by refusing to take her supplemental discharge to arbitration. Hav-

ing reviewed all the evidence, the Court concludes that the allegations contained in plaintiff's amended complaint and her papers opposing the summary judgment motions do not raise triable issues of fact as to whether the Union breached its duty. The Court will address each of plaintiff's charges in turn.

 In the Court's memorandum decision denying defendants' motion to dismiss, the Court allowed the DFR claim to go forward, but cautioned that

> much of Tomney's claim amounts to little more than that the Union failed to represent her adequately at arbitration. This alone is not sufficient, as "even negligence on the union's part does not give rise to a breach." *Barr*, 868 F.2d at 43. Further, the Union clearly achieved results for Tomney, as the arbitrator ordered her reinstated. The Union's failure to win Tomney back pay, standing alone, does not negate this achievement. In fact, the Award provides ample reason for the failure to provide back pay: the arbitrator found "no question" that Tomney was guilty of "unprofessional" conduct that was "unacceptable." (Award at 4). The decision to reinstate her was based on the fact that her conduct was not so serious as to merit immediate termination.

(Mem. Dec. at 14). Now that discovery is complete, sufficient evidence does not exist to support a reasonable jury finding that the Union violated its DFR during its representation of her in the arbitration. To the contrary, the evidence shows as a matter of law that the Union's representation was reasonable. This is evidenced by the arbitrator's Award, agreeing with the Union's counsel that ICD's actions were too harsh and ordering that Tomney be reinstated to her former position. (*See* Award at 7). The Union's attorney was successful in reversing ICD's termination decision and securing Tomney's job. The only part of the Award that did not favor Tomney was the arbitrator's decision not to award back pay. Under these circumstances, no reasonable jury could find a violation of the Union's DFR. *See Barr*, 868 F.2d at 43.

 To survive summary judgment, Tomney must show that there is "substantial reason to believe that [the Union's breach] contributed to the erroneous outcome of the contractual proceedings." *Hines v. Anchor Motor Freight*, 424 U.S. 554, 568, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). Plaintiff contends that the Union breached its DFR during the arbitration by not preparing her for her arbitration, not adequately cross-examining ICD witnesses, and not calling character witnesses to support her position. (Tomney Dep. at 17–22, 62–65). The undisputed evidence, however, shows that the Union counsel attempted to contact Tomney prior to the arbitration and also invited Tomney's private attorney to assist in the preparation of Tomney's case. (Miranda Aff. ¶¶ 19, 20, 25–29, 47). As to Tomney's contention that the Union did not adequately cross-examine ICD's witnesses, even if true, this would merely amount to "tactical errors" or "lapses in representation," not a violation of its DFR. *See Barr*, 868 F.2d at 43; *Santiago v. Nat'l Cleaning Contractors*, No. 88 Civ. 1172(CSH), 1992 WL 168258, at *6 (S.D.N.Y. June 29, 1992). Finally, the arbitrator allowed Tomney to proffer what she expected witnesses to say in support of her position, and the arbitrator considered this proffered testimony in rendering the Award. (*See* Tomney Dep. at 17; Award at 2).

Tomney's conclusory allegations that the Union's "representation of Tomney in her arbitration was so ineffective that it caused Tomney to lose her back pay award" is not supported by any concrete evidence. (*See* Pl.'s Opp. Mem. at 35).

*See Santiago,* 1992 WL 168258, at *6 (conclusory allegations about a Union's failed representation do not serve to defeat summary judgment). Given the results the Union counsel achieved for Tomney during the arbitration, combined with the submitted evidence describing the circumstances surrounding the arbitration, a reasonable jury could only conclude that the Union adequately represented Tomney during the arbitration and did not violate its DFR.

 Tomney's second contention, that the Union violated its DFR by not taking her supplemental termination to arbitration, is equally unavailing. A union has "broad discretion in its decision whether and how to pursue an employee's grievance against an employer." *Chauffeurs Teamsters & Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 567–68, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990) (citing *Vaca,* 386 U.S. at 185, 87 S.Ct. 903). This "discretion is essential to the proper functioning of the collective-bargaining system. Union supervision of employee complaints promotes settlements, avoids processing of frivolous claims, and strengthens the employer's confidence in the union. Without these screening and settlement procedures, ... the costs of private dispute resolution could ultimately render the system impracticable." *Int'l Bhd. of Elec. Workers v. Foust,* 442 U.S. 42, 51, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979) (internal citation omitted). The federal laws governing the union employer relationship simply do not give Tomney an absolute right to have her grievance taken to arbitration, regardless of its merit under the applicable CBA. *See Vaca,* 386 U.S. at 191, 87 S.Ct. 903; *Gold v. Local Union No. 888,* 758 F.Supp. 205, 207 (S.D.N.Y.1991).

Here, Local 815 grieved her supplemental termination, and then made a decision not to pursue arbitration based on the evidence learned through its investigation. (*See* Miranda Aff ¶¶ 42–44). For her part, Tomney argues that at the grievance hearing the Union "acted as ICD's partner when they ganged up on Tomney in a star chamber-like inquisition by attempting to force her to disclose publicly the identity of other employees who had removed client information from ICD's premises." (Pl.'s Opp. Mem. at 33). This contention by Tomney, however, is not accompanied by any citation to the record, nor does plaintiff point the Court to a single case supporting its position that the Union violated its DFR.[5] (*Id.* at 33–36).

There is no dispute that the Union encouraged Tomney to grieve the supplemental termination, and represented her at the grievance hearing. (Local 815's 56.1 Statement ¶ 21–23). There is also no real dispute that during the course of the Union's investigation, it learned that: (1) Tomney attested that she had been provided a copy of and understood ICD's confidentiality policy; (2) Tomney refused or was not able to name a single employee or supervisor at ICD who was aware of a practice at ICD whereby employees took confidential files home; (3) Tomney kept the files after the consumer had been assigned to another counselor and after her employment at ICD ended; and (4) the documents themselves revealed highly personal and confidential information. (*See* Miranda Aff. ¶¶ 40, 42, 43).

While some of Miranda's actions are questioned by Tomney, his decision not to arbitrate did not "amount[ ] to conduct and omissions 'so egregious, so far short of

---

**5.** Plaintiff has apparently conceded that the Union was obligated to turn over the confidential files to ICD, arguing only that Tomney requested that the Union counsel make redactions before producing them to ICD, not that the documents should not have been produced to ICD. (*See* Am. Compl. ¶ 78).

minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary.'" *Barr*, 868 F.2d at 43 (quoting *NLRB v. Local 282*, 740 F.2d 141, 147 (2d Cir.1984)); *Cruz v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1153–54 (2d Cir. 1994) ("[T]he duty of fair representation is not breached where the union fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance."); *see also Spellacy*, 156 F.3d at 130.

Tomney has failed to "set forth concrete, specific facts from which one can infer a union's hostility, discrimination, bad faith, or arbitrary exercise of discretion." *Spielmann v. Anchor Motor Freight, Inc.*, 551 F.Supp. 817, 822 (S.D.N.Y.1982). The Union was reasonable in determining that ICD was justified in firing Tomney for a second time. Tomney kept confidential consumer files in her home for more than nine months after she was fired from ICD and eleven months after she was relieved of her counseling duties for this consumer. Plaintiff's conclusory allegations against the Union do not amount to proof of a lack of good faith on the part of the Union, and thus fail to state a claim for relief. *See Santiago*, 1992 WL 168258, at *6.

No reasonable jury could conclude that Local 815 violated its DFR in connection with Tomney's arbitration of her first dismissal or the grieving of her supplemental dismissal. Thus, Tomney's claims against Local 815 are dismissed.

## II. *Tomney's Claims Against ICD*

### A. *Breach of the CBA*

It is well-settled that an employee may maintain a breach of contract action based upon a CBA directly against the employer only if "the employee can prove that the union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance." *Vaca*, 386 U.S. at 186, 87 S.Ct. 903. Hence, Tomney can only proceed on a breach of the CBA against ICD if the Union has violated its DFR. *Gold*, 758 F.Supp. at 208 ("Plaintiff has standing to bring such an action against the Company based on a breach of the collective bargaining agreement only if the union has breached its duty of fair representation."). Thus, as Local 815 fairly represented Tomney throughout the arbitration and supplemental grievance, the claims by Tomney against ICD for breach of contract based upon the CBA necessarily fail. *Carrion*, 227 F.3d at 33. As Tomney's allegations are "based upon breach of the collective bargaining agreement, [s]he is bound by terms of that agreement which govern the manner in which contractual rights may be enforced." *Vaca*, 386 U.S. at 184, 87 S.Ct. 903. The Union did not violate its DFR, and so Tomney's claims against ICD for violating the CBA are dismissed. *See Vaca*, 386 U.S. at 184, 87 S.Ct. 903.

### B. *Fair Labor Standards Act*

#### 1. *Applicable Law*

The FLSA sets minimum requirements for wage and overtime payments and prohibits employment for more than a specified number of hours per week without proper overtime compensation. 29 U.S.C. §§ 201–13; *see also* 29 C.F.R. § 785.5. To establish a FLSA claim, a plaintiff must prove that: (i) she was an employee who was eligible for overtime, and (ii) that she actually worked overtime hours. *See* 29 U.S.C. §§ 207, 213. Certain employees, however, are exempt: "Minimum wage and maximum hour requirements . . . shall not apply with respect to . . . any employee employed in a bona fide . . . professional . . . capacity." 29 U.S.C. § 213(a)(1).

The FLSA does not define the term "professional" for the purposes of exemp-

tion, but directs the Secretary of Labor to do so by regulation. 29 U.S.C. § 213(a)(1). The pertinent Department of Labor (the "DOL") regulation defines a "professional" employee as one:

(a) Whose primary duty consists of the performance of:

(1) Work requiring knowledge of an advance[d] type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study . . . ; and

(b) Whose work required the consistent exercise of discretion and judgment in its performance; and

(c) Whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; and . . .

(e) Who is compensated on a salary or fee basis at a rate of not less than . . . $250 per week.

29 C.F.R. § 541.3.[6]

▆▆▆▆▆ In defining types of exempt "professional" employees, the C.F.R. explains that:

The first element in the requirement is that the knowledge be of an advanced type. Thus, generally speaking, it must be knowledge which cannot be attained at the high school level. . . . Second, it must be knowledge in a field of science or learning . . . The requisite knowledge, in the third place, must be customarily acquired by a prolonged course of specialized intellectual instruction and study. . . . The typical symbol of the professional training and the best prima facie evidence of its possession is, of course, the appropriate academic degree, and in these professions an advanced degree is a standard, if not universal, prerequisite.

*Id.* § 541.301(a)-(e). If an employee earns more than $250 per week, then the "short test" is applied to determine whether the employee is exempt under the regulations. The short test reads as follows:

Provided further, [t]hat an employee who is compensated on a salary or fee basis at a rate of not less than $250 per week . . . and whose primary duty consists of the performance either of work [as a learned professional], which includes work requiring the consistent exercise of discretion and judgment . . . shall be deemed [exempt from the FLSA overtime pay requirements].

29 C.F.R. § 541.3(e). Exemptions to the FLSA are narrowly construed against the employer and the burden of establishing their applicability is upon the employer. *Moreau v. Klevenhagen,* 508 U.S. 22, 32, 113 S.Ct. 1905, 123 L.Ed.2d 584 (1993); *Martin v. Malcolm Pirnie, Inc.,* 949 F.2d 611, 614 (2d Cir.1991) (noting that "because the FLSA is a remedial act, its exemptions . . . are to be narrowly construed" and an employer must overcome a "presumption" of non-exemption); *Bennett v. Progressive Corp.,* 225 F.Supp.2d 190, 215 (N.D.N.Y.2002).[7] Whether employees' "particular activities excluded them from the overtime benefits of the FLSA is a question of law." *Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 714, 106 S.Ct.

---

**6.** References are to the C.F.R. at the time of plaintiff's claims, and not to the regulations as amended in 2004. *See* 69 Fed.Reg. 22,260 (Apr. 23, 2004).

**7.** Claims for violations of the FLSA must be brought within two years, except that the stat-

ute of limitations is extended to three years for willful violations. 29 U.S.C. § 255(a). *See Pollis v. New School for Social Research,* 132 F.3d 115, 119 (2d Cir.1997); *Gustafson v. Bell Atlantic Corp.,* 171 F.Supp.2d 311, 322 (S.D.N.Y.2001).

1527, 89 L.Ed.2d 739 (1986); *Freeman v. Nat'l Broadcasting Co.*, 80 F.3d 78, 82 (2d Cir.1996).

### 2. *Application*

■■■ Tomney is exempt under the FLSA as a matter of law because she is a learned professional with an advanced degree in vocational rehabilitation counseling who consistently exercised independent discretion and judgment in the counseling of her consumers and treatment recommendations. *See* 29 U.S.C. § 213(a)(1). Thus, her claims for overtime compensation under the FLSA are dismissed.

The "short test" applies, as the parties do not dispute that Tomney made more than $250 per week. The first part of the test is whether Tomney's "primary duty consists of the performance of ... [w]ork requiring knowledge of an advance[d] type in a field of science or learning." 29 C.F.R. § 541.3(a)(1); *see also Henkin v. Forest Labs., Inc.*, 01 Civ. 4255(AKH), 2003 WL 749236, at *9 (S.D.N.Y. March 5, 2003). This part is met, as the position of vocational rehabilitation counselor required a masters degree in the rehabilitation field, and additional work experience as a counselor. (2d Harrison Aff. ¶ 2). Tomney met these qualifications, as she had significant experience and a masters degree in rehabilitation counseling. (Tomney Dep. at 356, 385; ICD's 56.1 Statement ¶¶ 2, 25). Indeed, plaintiff concedes the first prong is met, arguing only that she fails the second part of the test. (Pl.'s Opp. Mem. at 37 ("Despite her learning, [Tomney] did not possess the requisite discretion.")). Thus, I conclude that a reasonable factfinder could only conclude that Tomney's position was one that required knowledge of an advanced type in a field of learning. *See id.* § 541.3(a)(1).

The second part of the test is whether Tomney exercised independent discretion and judgment. This part is met, as the record is clear that Tomney was given significant discretion when counseling ICD consumers, including the authority to (1) refer consumers for other programs at ICD, (2) refer them for additional counseling within ICD, and (2) provide extensive one-on-one counseling and advice. (*See* Tomney Dep. at 361). Tomney also made recommendations to others at ICD as to the placement of consumers in external programs. (*Id.*). Tomney described her duties as maintaining "close contact with the vocational [instructors] who did the teaching ... [and the] instructor would bring to my attention any problems they were having with the client that required me to intervene with counseling." (Tomney Dep. at 325–26). Tomney "provided counseling and all the paperwork that goes along with how the client was doing in the program." (*Id.* at 326). This activity is what the C.F.R. contemplates when it describes examples of employees who come under the "professional exemption." *See* 29 C.F.R. § 541.301(a)-(e).

Further evidencing discretion and independent judgment is the fact that Tomney's primary job was engaging in one-on-one counseling sessions with consumers who often suffered from medical, mental, and physical disabilities. (*Id.* at 326, 361). ICD trusted Tomney's judgment and discretion as her job required her to consistently dispense advice while counseling ICD consumers. (*Id.*). ICD attached to its memorandum of law a DOL opinion letter that determined that social caseworkers who managed cases of children and families to whom they were assigned were exempt from the FLSA under the professional exemption. (*See* ICD's Mem. of Law at 5–6). In its determination, the DOL found it significant that the caseworkers "decided what actions were necessary based on the facts of each individual case." (DOL Op. Letter at 2). Similarly, Tomney counseled the consumers assigned to her and decided appropriate treatment,

counseling, and job placement, based on the individual case. (*See* Tomney Dep. at 325–26).

The Court concludes that a reasonable factfinder could only find that Tomney was a learned professional who consistently exercised independent discretion and judgment. Hence, as a matter of law, Tomney is a "learned professional" and is exempt from the overtime requirements of the FLSA. *See Freeman*, 80 F.3d at 82. Plaintiff's cross-motion for summary judgment that ICD violated the FLSA is denied and ICD's motion for summary judgment dismissing the FLSA claims is granted.[8]

### C. *Age Discrimination*

#### 1. *Applicable Law*

■ I address plaintiff's federal and state and city law age discrimination claims together because "[c]laims made pursuant to the New York State Human Rights Law and the New York City Human Rights Law are subject to the same analysis as claims brought pursuant to the ADEA." *Molin v. Permafiber Corp.*, No. 01 Civ. 9279(SHS), 2002 WL 31760215, at *3 (S.D.N.Y. Dec.9, 2002) (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n. 1 (2d Cir.2000)); *see also Minton v. Lenox Hill Hosp.*, 160 F.Supp.2d 687, 693 (S.D.N.Y.2001).

■ The "ultimate issue" in any employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," *i.e.*, that there was discriminatory intent. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Fields v. N.Y. State Office of Mental Re-*

tardation & Developmental Disabilities, 115 F.3d 116, 119 (2d Cir.1997).

■ In the absence of direct evidence of discrimination, a plaintiff in an employment discrimination case usually relies on the three-step *McDonnell Douglas* test. First, a plaintiff must establish a *prima facie* case of unlawful discrimination by showing that (1) she is a member of a protected class (2) who performed her job satisfactorily (3) who suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (Title VII); *Stratton v. Dep't for the Aging*, 132 F.3d 869, 879 (2d Cir.1997) (ADEA).

■ Second, if the plaintiff establishes a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. *See Reeves*, 530 U.S. at 143, 120 S.Ct. 2097; *Stratton*, 132 F.3d at 879.

■ Third, if the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (citation omitted); *see James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir.2000). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason. *See Fields*, 115 F.3d at 120–21; *Connell v. Consol. Edison Co.*, 109 F.Supp.2d 202, 207 (S.D.N.Y.2000).

---

8. As the Court has found that Tomney is an exempt professional under the FLSA, the arguments by counsel about the evidence, or lack thereof, of Tomney's actual overtime hours worked between 1998 and 2000 is moot and will not be considered herein.

■ To meet this burden, the plaintiff may rely on evidence presented to establish her *prima facie* case as well as additional evidence. It is not sufficient, however, for a plaintiff merely to show that she satisfies *"McDonnell Douglas's* minimal requirements of a *prima facie* case" and to put forward "evidence from which a factfinder could find that the employer's explanation ... was false." *James,* 233 F.3d at 153. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.* at 157; *Connell,* 109 F.Supp.2d at 207–08.

As the Second Circuit observed in *James,* "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove—particularly discrimination." 233 F.3d at 157; *see Lapsley v. Columbia University–College of Physicians and Surgeons,* 999 F.Supp. 506, 513–16 (S.D.N.Y. 1998) (advocating elimination of *McDonnell Douglas* test in favor of simplified approach focusing on ultimate issue of whether sufficient evidence exists to permit jury to find discrimination); *see also Norton v. Sam's Club,* 145 F.3d 114, 118 (2d Cir.1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

### 2. *Application*

■ At the outset, I assume that plaintiff has made out the *prima facie* case required by *McDonnell Douglas.* ICD has articulated a legitimate, nondiscriminatory reason for plaintiff's dismissal, con-

tending that Tomney was (1) initially fired because of her insubordination, and (2) fired for a second time for violating ICD's confidentiality policies by taking confidential consumer files from ICD and keeping them for nine months after she was initially fired and nearly a year after she was no longer the consumer's counselor. Hence, I proceed directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find age discrimination. *See Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 314 (2d Cir.1997); *see also Siano v. Haber,* 40 F.Supp.2d 516, 520 (S.D.N.Y.), *aff'd mem.,* 201 F.3d 432, 1999 WL 1295923 (2d Cir.1999); *Lapsley,* 999 F.Supp. at 515.

Tomney does not allege that anyone at ICD made discriminatory comments to her based on her age. (Tomney Dep. at 682–83). In fact, in opposition to ICD's motion for summary judgment, Tomney does not even submit evidence as to her age, purportedly relying on the allegation in her complaint that she is over the age of 40.

■ Instead, plaintiff alleges that she was fired under circumstances giving rise to an inference of age discrimination because after she was dismissed, ICD replaced her with two younger individuals. (Tomney's Dep. at 614–20). This evidence, however, proves little, even assuming the facts alleged by Tomney are true. The age of replacement employees, standing alone, is not sufficient to prove discrimination. *See Byrnie v. Town of Cromwell, Bd. of Ed.,* 243 F.3d 93, 103 (2d Cir.2001); *Newsom–Lang v. Warren Int'l, Inc.,* 249 F.Supp.2d 292, 302 (S.D.N.Y.) ("[G]iven the absence of any age-related comments in connection with Plaintiff's termination, Plaintiff's allegations of a younger replacement does not provide evidence to support an inference of intentional discrimination."), *aff'd,* 80 Fed. Appx. 124, 2003 WL 22490366, at *3 (2d Cir. Nov.4, 2003). The

result could be different if even a scintilla of evidence existed that age was a factor in ICD's decisions to fire Tomney or to hire her replacement. *See Byrnie,* 243 F.3d at 103. There is no such evidence, however, and the mere fact that ICD hired employees who were younger than her is not sufficient to generate a genuine issue for trial.

Tomney's only additional evidence of age discrimination is that ICD purportedly fired or caused a disproportionally high number of employees over the age of 40 to leave ICD. (*See* Tomney Dep. at 683–84; Pl.'s Opp. Mem. at 31–32). In support of this claim, Tomney testified that "people that worked there would . . . call me and tell me things that had happened. That [is] how I got my information." (Tomney Dep. at 684). When asked specifically who called her and reported this information, Tomney could not remember, and added that "it just seemed as if the older ones were going." (*Id.*). In addition, plaintiff mentioned several ICD employees who were dismissed or left ICD. (*Id.* at 684–87). Tomney admits, however, that she does not know why these employees were discharged or left ICD, and she has no evidence that they were fired or left because of their age. (*Id.*). Thus, plaintiff's conclusory allegations about disproportionate treatment by ICD are not sufficient to defeat summary judgment. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir.1996) (to defeat summary judgment, plaintiff is obliged not just to produce "some" evidence, but must produce sufficient evidence to support a rational jury verdict in her favor); *Anyan v. N.Y. Life Ins. Co.,* 192 F.Supp.2d 228, 237–38 (S.D.N.Y.2002).

Plaintiff's counsel admits that the disproportionality evidence is "not as encompassing as it might be," but argues that the age discrimination claims should survive summary judgment because "ICD's unbelievable assertions for its reason for terminating Tomney is sufficient for her ADEA claim to be presented to a jury." (Pl.'s Opp. Mem. at 31–32). This is not the standard; the standard is whether Tomney's evidence "reasonably supports an inference of the facts plaintiff must prove—particularly discrimination." *James,* 233 F.3d at 157; *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. at 517, 113 S.Ct. 2742 (holding that in a discrimination case, plaintiff must prove that firing was a result of intentional discrimination); *Pullin v. Potter,* No. 01 Civ. 2641(DC), 2003 WL 1907203, at *4 (S.D.N.Y. Apr.18, 2003) (granting summary judgment when plaintiff's only evidence in support of age discrimination was "the mere fact that he was in the protected age category"). Here, sufficient evidence does not exist for a jury to find that defendant terminated plaintiff's employment at least in part because of her age. Accordingly, ICD's motion for summary judgment dismissing the federal and state claims alleging age discrimination is granted.[9]

### D. *ADA Claims*

#### 1. *Applicable Law*

For the most part, the ADA and corresponding New York State and City Human Rights Laws are construed similarly. *See Pace v. Paris Maint. Co.,* 107 F.Supp.2d 251, 266 (S.D.N.Y.2000) ("The same *McDonnell Douglas* burden-shifting analysis applies to NYHRL discrimination

---

9. ICD alleges that it was not notified by the EEOC of Tomney's EEOC amended complaint alleging age discrimination. (*See* ICD's Mem. of Law at 15–17). Accordingly, it did not respond and the EEOC issued a "reason-able cause" determination. As the Court has dismissed Tomney's claims of age discrimination, ICD's request to remand to the EEOC is denied as moot.

claims, whether brought pursuant to the ADA, Title VII, or other federal employment discrimination statutes."), *aff'd*, 7 Fed.Appx. 94 (2d Cir.2001). One area of disagreement, however, is in the definition of disability; the definition under state and city law is broader than the federal definition. *See Burton v. Metropolitan Transportation Auth.*, 244 F.Supp.2d 252, 257 (S.D.N.Y.2003) (discussing differences and citing cases). As the parties do not dispute that Tomney is disabled under the ADA's definition, the differences between the ADA and New York law do not affect the outcome or analysis of this decision.

The ADA prohibits employment discrimination against individuals with disabilities and provides that:

> [n]o [employer covered by the ADA] shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a); *see also Buckley v. Consolidated Edison, Co.*, 155 F.3d 150, 153–54 (2d Cir.1998). The ADA's definition of "discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee unless ... [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the ... [employer's] business." *Lyons v. Legal Aid Society*, 68 F.3d 1512, 1514 (2d Cir. 1995) (quoting 42 U.S.C. § 12112(b)(5)(A)).

To state a claim under the ADA, plaintiff must show that: "(1) [her] employer is subject to the ADA; (2)[s]he suffers from a disability within the meaning of the ADA; (3)[s]he could perform the essential functions of [her] job with or without reasonable accommodation; and (4)[s]he was fired because of [her] disability." *Reeves v. Johnson Controls World Services, Inc.*, 140 F.3d 144, 149–50 (2d Cir.1998) (citing *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869–70 (2d Cir.1998)).

### 2. *Application*

Considering the evidence as a whole, and resolving all conflicts in the evidence and drawing all reasonable inferences in plaintiff's favor, I conclude that a reasonable jury could find that ICD failed to make reasonable accommodations as requested by plaintiff and that plaintiff's disability was a factor in her dismissal. The ADA is different than other discrimination statutes, in part because it imposes an obligation on employers to reasonably accommodate an employee with a disability. *See Lyons*, 68 F.3d at 1514. Thus, an employer violates the ADA even if it does not "discriminate" in the traditional sense. It discriminates if it fails to reasonably accommodate an employee with a disability. *Id.*

Tomney's allegations concerning ICD's lack of accommodation coincide with Moriber starting at ICD in April 1999, and with ICD's effort to increase the number of consumers at ICD to meet contractual obligations with its sponsoring agencies. ICD has submitted substantial evidence that the changes at ICD affected everyone, not just Tomney. To be sure, it is undisputed that other employees at ICD who were not disabled shared the same complaints about Moriber and the increasing workload as Tomney.

Tomney, however, has submitted evidence that for a number of years before Moriber started at ICD, she received certain accommodations. A jury could conclude that it was unreasonable for ICD to deny her these accommodations after Moriber's arrival because ICD had provided

these accommodations to her for a number of years.

Specifically, a jury could find that Tomney's request in September 1999 to work only in the training unit was reasonable. Tomney's reason for this request was that the VIP unit was on a different floor, and it was difficult, because of her disability, for her to see the bulletin board with the attendance sheets. (Tomney Dep. at 332–34, 529). While ICD alleges that Tomney was able to do her job by relying on "other staff" to assist her with reading attendance sheets, Tomney alleges that there were times when a secretary was not available and climbing the stairs to the VIP unit during the day was difficult because of her disability. (*Id.* at 529). Material issues of fact exist as to why ICD denied Tomney's request, and whether ICD did accommodate Tomney when she worked in the VIP unit by providing her with assistance from other VIP employees. *Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 384 (2d Cir.1996) ("Whether or not something constitutes a reasonable accommodation is necessarily fact-specific."); *Lyons*, 68 F.3d at 1514.

Similarly, I cannot conclude based on the record before me that it was reasonable for ICD to deny Tomney's request to assign another ICD employee to make follow-up calls to consumers. Tomney alleges that for many years, ICD gave her priority with a unit secretary who assisted her in contacting consumers. In 1999, ICD stopped this accommodation, and added to her responsibilities. (Tomney Dep. at 501–04; 594–96). ICD, for its part, alleges that it always provided Tomney with assistance during intake interviews, but that it was important for the counselor to make the follow-up calls and maintain contact with the consumers. Thus, a jury must decide whether Tomney's request was reasonable.

A jury could also find that the two comments made by Moriber to Tomney in September 1999 and January 2000, showed a pretext for discrimination and are not stray remarks. *See Schreiber v. Worldco, LLC,* 324 F.Supp.2d 512, 518–19 (S.D.N.Y. 2004); *Zhang v. Barr Labs., Inc.,* No. 98 Civ. 5717, 2000 WL 565185, at *4 (S.D.N.Y. May 8, 2000) (citing cases). A jury should be allowed to consider Moriber's comments when evaluating ICD's reasonable accommodations, or lack thereof, under Moriber's tenure. Both comments are relevant to intent and pretext when a jury considers whether there was a "general atmosphere of discrimination" at ICD in 1999 and 2000. *See Warren,* 802 F.2d at 753.

 In contrast, Tomney's request for overtime in August 2000 was not a reasonable accommodation request. First, as discussed in the FLSA section, Tomney was an exempt employee and thus not entitled to overtime compensation. Second, the record is clear that disabled and non-disabled employees were asked to assist with extra work during this time because certain employees were on vacation. (*See* Tomney Dep. at 627–28). None of the otherwise similarly situated employees were paid overtime. In addition, Tomney does not even allege that she was not paid overtime because she was disabled. Given this, and the fact that plaintiff does not submit any arguments to the contrary in her opposition papers, I conclude that a jury could only find that paying Tomney overtime in August 2000 was not a reasonable accommodation request. *See Ryan,* 135 F.3d at 869–70.

 Likewise, Tomney's allegations of disability discrimination based on Moriber, Harrison, and Jacobson's "bullying" are dismissed.

First, Tomney admits that Moriber was not treating her poorly because of her

disability. (Tomney Dep. at 631). Second, Tomney admits that when she was asked by Moriber to take on additional work, other non-disabled employees were also asked to take on additional work. Finally, and most significantly, Tomney admits that Moriber was aggressive, loud and intimidating to many employees at ICD, so much so that some were leaving ICD, and Moriber's conduct was the subject of the Union collective bargaining sessions. (*Id.* at 631–32). *See Pace*, 107 F.Supp.2d at 262 (granting summary judgment where a supervisor was "very demanding, difficult, rude, and obnoxious individual who treated everyone in the same manner"). Hence, I conclude that while Moriber's allegedly discriminating comments described above should be submitted to a jury, no jury could conclude that ICD discriminated against Tomney based on Moriber's "bullying."

As to Tomney's allegations against Jacobson and Harrison, they are conclusory and are not supported by the record. While Tomney complains about her treatment by Jacobson and Harrison, she admits that she does not know how they treat other employees, nor does she allege that their treatment of her had anything to do with her disability. *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001).

Hence, ICD's motion for summary judgment dismissing Tomney's disability discrimination claims is denied in part. Specifically, a jury must decide whether Tomney's accommodation requests to be (1) assigned only to the training unit, and (2) assigned a secretary to assist her with follow-up calls, were reasonable accommodation requests. In addition, at trial, plaintiff will be allowed to introduce testimony concerning Moriber's comments in 1999 and 2000.

ICD's motion for summary judgment dismissing Tomney's claims for lack of ac-commodation based on ICD's denial of overtime compensation is granted, as is ICD's motion for summary judgment dismissing Tomney's additional allegations and claims of discrimination based on purported "bullying" by Moriber, Jacobson, and Harrison.

### E. *Retaliation*

#### 1. *Applicable Law*

To establish a prima facie case of retaliatory discharge, Tomney must show that (1) she was engaged in protected activity; (2) the defendant was aware of that activity; (3) she was discharged; and (4) there was a causal connection between the protected activity and the termination or suspension. *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir.2003). Although the burden that a plaintiff must meet at the prima facie stage is *de minimis*, the plaintiff must at least proffer competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. *See Cronin v. Aetna Life Ins.*, 46 F.3d 196, 204 (2d Cir. 1995).

#### 2. *Application*

Retaliation claims are similarly governed by the burden-shifting framework set out by the Supreme Court in *McDonnell Douglas*. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 764 (2d Cir.1998). Again, I assume that plaintiff has made out the *prima facie* case required by *McDonnell Douglas*. ICD has articulated a legitimate, nondiscriminatory reason for plaintiff's supplemental dismissal, contending that Tomney was discharged for a second time for violating ICD's confidentiality policies by taking confidential consumer files from ICD and keeping them for nine months after she was initially fired and nearly a year after she was no longer the consumer's counsel-

or. Thus, I proceed directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find retaliation.

 The Court concludes that issues of fact exist as to whether Tomney was fired in September 2001 in retaliation for her filing an EEOC complaint. The question is close, as ICD correctly argues that timing, *i.e.*, that Tomney filed a complaint in July 2001 and was fired in September 2001, is not enough by itself to prove retaliation. *See Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir.2000); *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 86 (2d Cir.1990) (affirming summary judgment where there was a three-month gap because of lack of evidence showing a causal nexus between the termination and an age discrimination complaint); *Ponniah Das v. Our Lady of Mercy Med. Cntr.*, No. 00 Civ. 2574(JSM), 2002 WL 826877, at *12 (S.D.N.Y. Apr.30, 2002) ("Proximity in time alone will not support a finding ... that a plaintiff has proved a causal connection between protected activity and an adverse employment action.").

The timing here, however, is supported by other evidence of a causal connection. Tomney has submitted evidence that ICD's confidentiality policy was practiced in the breach, and that many employees took confidential materials home. This evidence has been submitted through affidavits of other employees, as well as by Tomney herself. This is contrasted with ICD's contention that Tomney had a clear understanding of ICD's confidentiality policy and knew that she could be fired for violating it. While there is no dispute that Tomney kept confidential ICD files after she was relieved of her counseling duties of the consumer and for eleven months after she was fired from ICD, a reasonable jury could conclude that ICD's immediate decision to fire Tomney for a second time was in retaliation for Tomney's filing of an EEOC complaint. Significantly, neither party has submitted evidence of other employees at ICD being disciplined for similar conduct.

In addition, summary judgment on Tomney's claims of retaliation is inappropriate because the issue of retaliation may be affected by issues of fact surrounding Tomney's initial discharge. If a jury finds that ICD failed to accommodate Tomney and that the failure to accommodate led to performance issues that in turn resulted in her first discharge, it could find that her second discharge was also a result of ICD's failure to accommodate.

Thus, a jury must decide whether ICD's decision to fire Tomney for a second time was based, at least in part, on an intent to retaliate against her for filing an EEOC complaint. ICD's motion for summary judgment dismissing the retaliation claims by Tomney is denied.

### CONCLUSION

For the foregoing reasons, the Union's motion for summary judgment dismissing the claims in the amended complaint alleging DFR violations is granted. ICD's motion for summary judgment is granted in part and denied in part. The claims alleging violations of the CBA and the FLSA are dismissed, as are those claims alleging age discrimination. The claims alleging disability discrimination and unlawful retaliation remain. Plaintiff's cross-motion for partial summary judgment is denied. Counsel for Tomney and ICD shall appear for a final pre-trial conference on March 4, 2005, at 11:00 a.m.

SO ORDERED.