Lisa ASP & Paulette Mertes,
Plaintiffs,

v.

MILARDO PHOTOGRAPHY, INC., Snapshot Photography, LLC, Theodore Milardo, Elizabeth Milardo, Defendants.

No. 3:04 CV 1016(DJS).

United States District Court,
D. Connecticut.

Aug. 28, 2008.

Anthony J. Pantuso, III, Richard Eugene Hayber, Hayber & Pantuso, Hartford, CT, for Plaintiffs.

Glenn A. Duhl, Siegel, O'Connor, O'Donnell & Beck, P.C., Hartford, CT, Shawn Patrick Coyne, Electric Boat Corp., Groton, CT, for Defendants.

## *MEMORANDUM OF DECISION*

DOMINIC J. SQUATRITO, District Judge.

The Plaintiffs, Lisa Asp ("Asp") and Paulette Mertes ("Mertes") (collectively, "the Plaintiffs"), bring this action for damages and injunctive relief against the Defendants, Milardo Photography, Inc.[1] ("Milardo Photo"), Snapshot Photography, LLC ("Snapshot Photo"), Theodore Milar-

do ("Ted"), and Elizabeth Milardo ("Liz") (collectively, "the Defendants"), alleging violations including witness tampering, age discrimination, defamation, and numerous claims of retaliation and failure to pay overtime. The Defendants' filed an Answer that included twelve Counterclaims including claims for theft, misappropriation of trade secrets, unjust enrichment, computer conversion, violation of Connecticut Unfair Trade Practices Acts ("CUTPA") and tortious interference with business relations. Now pending before the Court is the Plaintiffs' motion for partial summary judgment **(dkt. # 41)**[2]. **For the reasons stated herein, the Plaintiffs' motion for summary judgment (dkt. # 41) is DENIED.**

## I. FACTS

Ted and Liz Milardo are the owners of Milardo Photo in Middletown, Connecticut. Since 1993, Milardo Photo has engaged in the business of portrait photography. In or around March of 2001, Milardo Photo sought to transition from a film studio to a digital studio to keep with evolving technology and customer demand, as well as to change to a custom portrait studio. To facilitate the transition, Milardo Photo purchased new equipment, including software programs Adobe Photoshop 7 Professional, Kodak Professional DP2 software and Corel Painter. In addition, Milardo Photo needed to hire a photographer who could work with the new technology.

---

1. Throughout the time period relevant to this case Milardo Photography, Inc. was doing business as Images Photography. For the purposes of this motion, the Court will refer to this business solely as Milardo Photo.

2. The Court notes that the motion before the Court is properly characterized as a motion for partial summary judgment because it only seeks to dismiss a portion of the Plaintiffs claims and a portion of the Defendants' Coun-

terclaims. In addition, the Plaintiffs' motion for partial summary judgment, memorandum in support of the motion for partial summary judgment and Local Rule 56(a)(1) Statement each have the same docket number. Therefore, the Court will refer to the motion for partial summary judgment as (dkt. # 41), the memorandum in support of the motion for partial summary judgment as (dkt. # 41, pt. a), and the Local Rule 56(a)(1) Statement as (dkt. # 41, pt. b).

## A. THE HIRING OF THE PLAINTIFFS

In early March 2001 Asp was hired by the Defendants to work in a customer service position. When Asp heard of the new photographer position she wanted to apply. Asp was qualified for this position because she held an art degree, had a strong photography background, was an expert in Photoshop and had an impressive portrait photography portfolio. Ted believed that the new position required portrait photography experience and exceptional artistic skill. After expressing an interest in the opening, Asp was promoted from her customer service position to the new position in March 2001.

The new position required Asp to visualize a final portrait before taking the photo. She would create a scene for the photo, make lighting adjustments, and direct the subject to pose in a certain way. Asp or Ted would photograph the client and then it was up to Asp to decide which of the hundred or more images would be most appropriate for the final portrait. Asp would use Photoshop to employ artistic techniques like image enhancement, manipulation and editing prior to creating the final portrait. Asp would also assess the subject's body position and pose. The final portrait needed adjustments to the to color, saturation, skin tone, lighting and composition. This required a number of enhancements to the raw image. Asp was compensated on a salary basis in the following manner: (1) after her promotion she was compensated at a rate of $440 per week; (2) on or around May 6, 2001 she received a raise to $500 per week; (3) on or around October 21, 2001, she received a raise to $600 per week; and (4) on or around June 2, 2002, she received a raise to $650 per week.

In June 2001, Milardo Photo decided to hire another employee. Asp recommended Mertes for the position and on October 22, 2001, Milardo Photo hired Mertes. Mertes was compensated at a rate of $650 per week and worked from October 23, 2001 until December 24, 2002, when she was terminated. Generally, Mertes' duties ranged from customer service and sales to marketing the studio, developing business platforms and many other day-to-day operations within the studio. There is disagreement amongst the parties, however, as to whether Mertes held the title of "supervisor" such that Asp reported to Mertes. Prior to hiring Mertes, Liz was concerned with whether Mertes was capable of working with Asp due to their friendship. Liz communicated these concerns to both women.

## B. THE CHRISTMAS PHOTOS

On December 12, 2002, Mertes asked Liz if she and Asp could use the studio and equipment to take Christmas photographs of their families on the upcoming Sunday and Monday. The parties differ as to Liz's approval. The Plaintiffs argue that Liz approved the request for both Mertes and Liz, but Liz states that she approved the request only for Mertes and only for Sunday. On Sunday, the Plaintiffs used the studio to take the holiday photos of Mertes' family. After work finished on Monday, the Plaintiffs used the studio to take pictures of Asp's family. That Tuesday, Mertes faxed an order for a picture frame to J. Whitney Frame Gallery ("J. Whitney"), the framing vendor that the Defendants had used. Mertes ordered the frame using the Defendants account so that she could obtain the wholesale price. Mertes sent her photographs to J. Whitney using Federal Express.

On Wednesday, December 18, 2002, Asp printed the photos of her family while she was at work and presented Ted and Liz with a Christmas card. The Defendants deny thanking Asp for the card or saying

they liked it. On Thursday, December 19, 2002 Ted drove to J. Whitney and picked up several framing orders, including Mertes' order. Mertes argues that attached to the front of the frame was a framing order with the price and her name on it. The Plaintiffs claim that later that day Asp wrote out an accounting of the quantities of photos that she had printed for her and Mertes' family, and that the accounting was provided to Milardo Photo as an offer to pay for the prints. On Friday, December 19, 2002, Liz said to Mertes that she heard of the frame purchase and wanted to see it. Mertes responded that the frame was at home and Liz voiced no objections to the transaction because, at that time, she believed Mertes had paid for the frame. Mertes claims that she left an approximately $165 check for the frame in the register of Milardo Photo.

### C. THE TERMINATION OF MERTES

On December 24, 2002, the Defendants terminated Mertes. The Defendants claim that the termination, in part, was based on customer service issues. The Plaintiffs argue that Ted told Mertes she was being terminated for her failure to follow up with three customers who had not yet picked up their holiday photos. The Plaintiffs further argue that this reason is not rational because the three customers names had been crossed off the list that Liz had given to Mertes.

On January 2, 2003, Liz met with Asp and told her that she needed to be able to trust her, and if she could not trust her, that Asp should leave. Liz told Asp that she believed Mertes had stolen the photos and that Asp had helped her. Liz also told Asp that she believed Asp had stolen photos. On January 4, 2003, Mertes received a letter from Liz requesting that Mertes pay full market price for the photos she printed on December 16, 2002 and that she

pay J. Whitney for the frame. At the request of Mertes, Asp printed out an price list so that Mertes could clarify the charges.

On January 10, 2003, Mertes made an unemployment claim with the Connecticut Department of Labor ("CDOL"). The Defendants received notice of the unemployment claim, a copy of the affidavit, and a letter asserting Mertes' rights under the law. On February 10, 2003, Mertes, through her attorney, contacted Ted and Liz's then attorney and informed him that Mertes had left a check in the register. On February 14, 2003, Mertes, through her counsel, wrote to Ted and Liz's attorney and demanded the payment of money damages for the termination.

### D. THE RESIGNATION OF ASP

On February 24, 2003 Liz reported the Plaintiffs to the Middletown Police Department and accused them of larceny. The basis for the theft claims were Asp's allegedly unauthorized use of the studio to take holiday photographs and print them without permission, and Asp's and Mertes' unauthorized printing and frame orders. The signed statement by Liz and Ted contained the following reasons for the theft claim: (1) that Asp had printed the Christmas photographs of Mertes and her family without permission; (2) that Mertes had placed a frame order from J. Whitney through Milardo's account without Liz's permission; (3) that Mertes had failed to pay for the frame that she ordered from J. Whitney, (4) that Mertes had taken photographs of Asp, her husband and her dog during business hours without the knowledge of Liz or Ted; (5) that neither Ted nor Liz had given permission for any of these activities; (6) that Ted and Liz had terminated Mertes for, among other reasons, the theft of the photographs and frame; (7) that Liz had suspected that Asp

was lying on January 2, 2003 when Asp said that she thought she had permission to use the studio and print the photographs; (8) that Mertes had placed a framing order for Asp back in August 2002 for $38.50 without Liz's knowledge; and (9) that Liz concluded she did not like Asp on January 9, 2003.

On February 25, 2003, Detective Barone ("Barone") called Milardo Photo to reach Asp regarding the investigation of larceny charges against Mertes. Asp went to Barone's office and decided that she did not wish to speak to him without an attorney. Asp returned to work and the next day filed her letter of resignation due to the police report that was filed by Ted and Liz.

## E. THE ARREST OF THE PLAINTIFFS

On February 27, 2003, Asp made a claim for unemployment benefits stating that she voluntarily resigned for cause attributable to her employer's filing of the police report. On the same day, Liz sent Barone an additional note stating that: (1) she had not known that Mertes had placed an order for the frame though her account; (2) Asp's use of the studio was done without her knowledge and permission; (3) Asp had printed photographs worth $190.80 in the past; and (4) Asp had not paid for the frame that she purchased through the studio in August 2002.

The report accused Asp of stealing $460.75 worth of goods and services and provided four (4) invoices. The first invoice was for a portrait session that Asp allegedly did not have permission to conduct and cost $69.90. The second invoice was for the Christmas cards and photos that Asp printed on December 18, 2002, which cost the studio $204.05. The Plaintiff claims that because the Defendants had a prior practice of not charging for these photos, no loss incurred, except for

the cost of paper in the amount of $4.50. These two invoices were given to the police despite the fact that on January 2, 2003, Liz learned that Asp had been told by Mertes that she had obtained permission for Asp to use the studio. The third invoice was for prints of Asp's dog. The fourth invoice was for a frame in the amount of $79.50, but Asp claims it was already paid for at the wholesale reduced price of $40.00.

The report also accused Mertes of committing larceny and Liz supplied invoices for proof. The first invoice was for $490.19 representing the cost of the photos that Mertes had printed without permission. The second invoice was for $318.00 and was the retail price for the J. Whitney frame, which Mertes claims she had already paid for when she left the $165 check in the register.

On March 7, 2003 the Plaintiffs responded to charges of larceny and asserted that they had permission to use the studio because it was Milardo Photo's prior practice to allow such use. The Plaintiffs showed that, by example, they had taken several photographs in the past that were now hanging in the studio. The Plaintiffs also explained that Mertes' check had been left in the register and that since then Mertes issued a new check to J. Whitney. Barone then contacted Liz for a response and she provided him with additional information.

On April 1, 2003 the Plaintiffs filed claims with the Connecticut Commission on Human Rights and Opportunities (CCHRO) claiming that Mertes was fired because of her age and that Asp was constructively discharged in retaliation for having signed the affidavit.

On April 7, 2003, the Plaintiffs were arrested by Middletown Police and charged with larceny. On April 9, 2003, the Middletown Press reported that the Plaintiffs had been charged with fifth de-

gree larceny. On June 4, 2003, Barone interviewed Ted who gave statements that contradicted Liz's statements; specifically, that there were photos that the Plaintiffs had taken in the past that were hanging in the studio and that his wife had received a Christmas card from Asp.

### F. THE OPENING OF STUDIO 970

In November 2002, the Plaintiffs spoke about the possibility of opening a new business On December 3, 2003, the Plaintiffs signed a lease proposal with RLM Co. to lease a premises in West Hartford, Connecticut. On January 19, 2003, the Plaintiffs purchased a domain name for their studio's website and in July, 2003, the Plaintiffs opened their studio.

### II. DISCUSSION

Pending before the Court is the Plaintiffs' motion for partial summary judgment. The Plaintiffs argue that judgment should enter on the Plaintiffs overtime compensation claims. The overtime compensation claims are contained in the following counts of the Complaint: Count Five, the failure to pay overtime in violation of the Federal Fair Labor Standards Act, 29 U.S.C. § 207 ("FLSA"), as to Asp against Milardo Photo, Ted and Liz; Count Six, the failure to pay overtime in violation of Connecticut's Minimum Wage Act, Connecticut General Statutes (Conn. Gen.Stat.) §§ 31–58, *et seq.* ("CMWA"), as to Asp against Milardo Photo, Ted and Liz; Count Seven, the failure to pay overtime in violation of the FLSA as to Mertes against Milardo Photo, Ted and Liz; and Count Eight, the failure to pay overtime in violation of the CMWA as to Mertes against Milardo Photo, Ted and Liz.

The Plaintiffs also argue that judgment should enter for them on the Defendants' Counterclaims contained in the following counts of the Answer: Count Five, unjust enrichment against Asp; Count Six, unjust enrichment against Mertes; Count Seven,

computer conversion against Asp; Count Eight, computer conversion against Mertes; Count Nine, violation of CUTPA against Asp; Count Ten, violation of CUTPA against Mertes; Count Eleven, tortious interference with business relations against Asp; and Count Twelve, tortious interference with business relations against Mertes.

The grounds for the Plaintiffs' motion are that they have established their prima facie case for overtime compensation, the Defendants cannot prove the asserted exemptions clearly and unmistakably apply. The Defendants counter that summary judgment should not enter on the claims of overtime compensation because Mertes is exempt as an "administrative" employee whose primary duties required discretion and consisted of performing office or non-manual work that was directly related to the policies and operations of Milardo Photo. In addition, the Defendants argue that Asp is also exempt as an "artistic professional" employee. The Defendants also counter that the Plaintiffs are not entitled to summary judgment on the Counterclaims because there are genuine issues of material facts concerning whether the Plaintiffs stole the Defendants' customer and financial information.

### A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect

to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.' " *Am. Int'l Group, Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine " 'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

### B. THE PLAINTIFFS' CLAIMS— UNPAID OVERTIME

The Plaintiffs argue that they are entitled to unpaid overtime wages under the FLSA and the CMWA.

In general, the parties dispute whether the Plaintiffs were salaried exempt workers. The Plaintiffs claim that they were not salaried exempt because they recorded hours on time sheets that they submitted to the Defendants. The Plaintiffs argue that they frequently worked more than forty hours in a week but were never paid overtime. The Defendants contend that the Plaintiffs recorded hours on their time sheets that were not devoted to work and that throughout the majority of the Plaintiffs employment, Milardo Photo only booked clients between the hours of 10:00 a.m. and 5:00 p.m. The Defendants also

contend that because they viewed the Plaintiffs as salaried exempt employees there was never a reason to question what the Plaintiffs had written down on the time sheets.

The Defendants argue that the Plaintiffs were salaried exempt workers because Liz had prior experience and had taken classes on the applicable exemptions under wage and hour law. Prior to characterizing the Plaintiffs as exempt employees, Liz had reviewed brochures by the Connecticut Department of Labor ("CDOL") concerning the exemptions, she spoke with the CDOL Commissioner regarding the decision to make her employees exempt, she spoke with the Connecticut Unemployment Compensations Commission ("CUCC") regarding overtime issues with salaried exempt employees, and she was informed by the CDOL and CUCC that she was in compliance with the wage and hour law. The Defendants admit, however, that they did not post the Connecticut or Federal Wage/Hour posters in the workplace. The Plaintiffs never inquired about their exempt status or did they demand that Milardo Photo pay them for overtime.

#### 1. Overtime Wages Under FLSA

The Plaintiffs argue that they are entitled to unpaid overtime wages under the FLSA. The Defendants argue that the Plaintiffs are exempt from overtime compensation because Mertes was an "administrative" employee and Asp was an "artistic professional" employee.

Sections 6 and 7 of the FLSA guarantee certain employees a minimum wage and overtime pay. *See* 29 U.S.C. §§ 206, 207. Section 7(a) of the FLSA directs employers who regularly require their workers to work more than forty hours a week to compensate those workers by paying them overtime wages at a rate of one and half times their regular rate of pay. 29 U.S.C. § 207. "Congress intended the FLSA to

aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage." *Freeman v. National Broad. Co.*, 80 F.3d 78, 86 (2d Cir.1996) (quoting *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n. 18, 65 S.Ct. 895, 89 L.Ed. 1296 (1945)).

Not all workers are covered by this scheme. Under section 13(a) of the FLSA, Congress exempted employees employed in a bona fide executive, "administrative," or professional capacity from the requirements of section 7(a). 29 U.S.C. § 213. The Department of Labor ("DOL") has enacted regulations[3] that establish a' two-pronged analysis for determining whether an employee is an exempt professional, consisting of what is referred to as a "duties" test and a "salary [basis]" test. *Reich v. Waldbaum, Inc.*, 52 F.3d 35, 39 (2d Cir.1995); *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 613 (2d Cir.1991), *cert. denied*, 506 U.S. 905, 113 S.Ct. 298, 121 L.Ed.2d 222 (1992). In order to qualify under an exempt category, an employee's position must meet both tests. *Id.*

### i. The "Salary Basis" Test

The "salary basis" test contains two elements: a requirement that the exempt employee receive no less than· a certain level of compensation, specified in the regulation, *see* 29 C.F.R. §§ 541.2 and 541.3, and a requirement that the employee's compensation be paid "on a salary basis." *Hoffmann v. Sbarro, Inc.*, 982 F.Supp. 249, 250–51 (S.D.N.Y.1997). Under the regulations, to be paid "on a salary basis," an employee must receive compensation in "a predetermined amount . . . not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.118(a).

Here, there is no dispute that both prongs of the "salary basis" test are satisfied. A review of the pay records reveals that the Plaintiffs each received no less than their salary, which was paid on "a salary basis" of once a week. (Dkt. # 44, Ex. X.) Accordingly, the Defendants have satisfied the "salary basis" test such that the Plaintiffs' claim that they are not exempt must be rejected. For the purpose of continuity, the Court will consider whether the Plaintiffs meet the "duties" test set forth in 29 C.F.R. § 541.2(e).

### ii. The "Duties" Test

The DOL regulations also explain the scope of the "administrative" and "professional" exemptions at issue in this case and provide different definitions of "administrative" and "professional" employees depending on the ·employee's salary. If an employee·earns more than $250 per week, the employer must show that the employee meets the "short test" definition of bona fide "administrative" or professional capacity in order to prove that she is exempt from section 7(a). *See* 29 C.F.R.

---

**3.** The regulations promulgated by the Secretary of Labor pursuant to an express grant of authority from Congress under the FLSA have the force and effect of law. They are to be given controlling weight unless they are found to be arbitrary, capricious, or manifestly contrary to the statute. *Freeman v. National Broadcasting Co.*, 80 F.3d 78, 82 (2d Cir.1996) (citations omitted); *Reich v. State of New York*, 3 F.3d 581, 587 (2d Cir.1993), *cert. denied*, 510 U.S. 1163, 114 S.Ct. 1187, 127 L.Ed.2d 537 (1994). In contrast to the legislative regulations, the Secretary's interpretive regulations are not binding and do not have the force and effect of law. *Freeman*, 80 F.3d at 83; *Reich v. State of New York*, 3 F.3d at 587. The weight they are to be accorded depends on their persuasiveness. *Reich v. State of New York*, 3 F.3d at 587–88. Generally, however, they are entitled to considerable weight because they constitute a body of experience and informed judgment to which courts may properly resort for guidance. *Id.* at 588; *Reich v. American International Adjustment Co.*, 902 F.Supp. 321, 324 (D.Conn. 1994).

§§ 541.2(e)(2), 541.3(e). If the employee earns less than $250 per week, then the employer must meet the rigorous "long test" in order to prove that the employee is exempt from section 7(a). *See* 29 C.F.R. §§ 541.2(a)-(e), 541.3(a)-(e). Since it is undisputed that the Plaintiffs earned more than $250 per week, the "short test" applies in this case.

### a. "Administrative" Employee Under FLSA

Under the "short test," the DOL regulation defines an "administrative" employee as any employee:

> whose primary duty consists of the performance of ... ["office or nonmanual work directly related to management policies or general business operations of his employer or his employer's customers ...] which includes work requiring the exercise of discretion and independent judgment, shall be deemed to meet all the requirements of this section.

29 C.F.R. § 541.2(e)(2).[4] Thus, Mertes is an exempt "administrative" employee if the Court finds: (1) she engaged in administrative work; (2) the administrative work was her primary duty; (3) the administrative primary duties were directly related to Milardo Photo's policies or operations; and (4) her work included exercising discretion and independent judgment.

First, the Court must determine whether an employee's primary duty is administrative in nature. To decide this issue the Court must distinguish whether an employee's duties relate to the "administrative operations" of the business or the "production" and sales side of the business. 29 C.F.R. § 541.205(a). This is often referred to as the administrative/production dichotomy and is elaborated on in subsection (b). The administrative opera-

tions of the business include the work performed by "so-called white-collar employees engaged in 'servicing' a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, and business research and control." 29 C.F.R. § 541.205(b). The regulations state that an employee performing such work is engaged in activities relating to the administrative operations of the business even if he is employed, for example, as an administrative assistant to an executive in the production department of the business. *Id.*; *see Reich v. State of New York*, 3 F.3d at 588–89; *Martin·v. Cooper Elec. Supply Co.*, 940 F.2d 896, 902 (3d Cir.1991).

Second, the Court must determine whether the administrative acts' were the employee's primary duties. The primary duty rule is in the interpretive regulations for "executive" employees, 29 C.F.R. § 541.103, which also apply to "administrative" employees. 29 C.F.R. § 541.206(b). "[A] good rule of thumb [is] that primary duty means the major part, or over 50 percent, of the employee's time." 29 C.F.R. § 541.103. However, "time alone ... is not the sole test" and an employee "may nevertheless have management as his primary duty if the other pertinent factors support such a conclusion." *Id.*; *see also Donovan v. Burger King Corp.*, 675 F.2d 516, 521 (2d Cir.1982) (internal quotation marks omitted). Under the "short test," an employee's primary duty is typically what·she does that is of principal value to the employer, rather than the collateral tasks that she may also perform, even if they consume more than 50% of her time. *Dalheim v. KDFW–TV*, 918 F.2d 1220, 1227 (5th Cir.1990); *Spinden v. GS Roofing Products Co.*, 94 F.3d 421, 426–27 (8th Cir.1996), *cert. denied*, 520

---

**4.** References are to the C.F.R. at the time the Plaintiffs commenced this action on June 22, 2004, prior to the regulations as amended in 2004.

U.S. 1120, 117 S.Ct. 1254, 137 L.Ed.2d 334 (1997). Some of the pertinent factors to consider are the relative importance of the administrative duties she performs, as compared to the other collateral tasks; the frequency with which the employee exercises discretionary powers; his or her relative freedom from supervision; and the relationship between her salary and the wages paid to other employees for the kind of nonexempt work that she performs. 29 C.F.R. § 541.206(b); *see also Spinden,* 94 F.3d at 427.

Third, the Court must determine whether the administrative primary duties were directly related to management policies or general business operations. Section 541.205(c) explains the significance of the phrase "directly related to management policies or general business operations":

> (1) It is not possible to lay down specific rules that will indicate the precise point at which work becomes of substantial importance to the management or operation of a business. It should be clear that the cashier of a bank performs work at a responsible level and may therefore be said to be performing work directly related to management policies or general business operations. On the other hand, the bank teller does not. (2) An employee performing routine clerical duties obviously is not performing work of substantial importance to the management or operation of the business even though he may exercise some measure of discretion and judgment as to the manner in which he performs his clerical tasks.... An employee operating very expensive equipment may cause serious loss to his employer by the improper performance of his duties. An inspector, such as, for example, an inspector for an insurance company, may cause loss to his employer by the failure to perform his job properly. But such employees, obviously, are not performing work of such

substantial importance to the management or operation of the business that it can be said to be "directly related to management policies or general business operations" as that phrase is used in Sec. 541.2.

29 C.F.R. § 541.205(c)(1)-(2).

The regulations provide a number of examples of types of employment that meet this test, including statisticians who analyze data and draw conclusions which are important to the determination of policy, 29 C.F.R. § 541.205(c)(3); advisory specialists and consultants, safety directors, promotion men, 29 C.F.R. § 541.205(c)(5); and systems analysts and programmers who are concerned with planning, scheduling, and coordination of activities required to develop systems for processing data to obtain solutions to complex business, scientific, or engineering problems, 29 C.F.R. § 541.205(c)(7). It is worth reiterating, there are no specific rules that will indicate the precise point at which work becomes of substantial importance to the management and operation of a business. 29 C.F.R. § 541.205(c)(1).

Fourth, the Court must determine whether the employee's work included exercising discretion and independent judgment. Section 541.207(a) provides guidance regarding what constitutes the exercise of discretion and independent judgement:

> In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term used in the regulations in subpart A of this part, more over, implies that the person has the authority or power to make an independent choice, free from immediate di-

rection or supervision and with respect to matters of significance.

29 C.F.R. § 541.207(a).

In addition, section 541.207(c) distinguishes the exercise of discretion and independent judgement from the use of skill in applying techniques, procedures, or specific standards:

(1) Perhaps the most frequent cause of misapplication of the term "discretion and independent judgement" is the failure to distinguish it from the use of skill in various respects. An employee who merely applies his knowledge in following prescribed procedures or determining which procedures follow, or who determines whether specified standards are met ... is not exercising discretion and independent judgment within the meaning of Sec. 541.2. This is true even if there is some leeway in reaching a conclusion, as when an acceptable standard includes a range or a tolerance above or below a specific standard.

(2) A typical example of the application of skills and procedures is ordinary inspection work of various kinds. Inspectors normally perform specialized work along standardized lines involving well-established techniques and procedures which have been catalogued and described in manuals or other sources. Such inspectors rely on techniques and skills acquired by special training or experience. They may have some leeway in the performance of their work but only within closely prescribed limits.

29 C.F.R. § 541.20(c)(1)-(2).

■ Given these standards, any inquiry into exempt status is necessarily fact intensive. The FLSA is a remedial statute and its exemptions must be narrowly construed against the employer who bears the burden of proving that its employees fall within one of those exemptions. *Malcolm Pirnie, Inc.,* 949 F.2d at 614. Accordingly, the employee must fit "plainly and unmis-

takenly within [the exemption's] terms." *See Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 396, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960). Therefore, for the Defendants to survive summary judgment, they must raise a genuine issue of material fact suggesting that Mertes' primary duty consisted of administrative work that included the exercise of discretion.

In this case, the Plaintiffs argue that Mertes' is entitled to summary judgment because her duties were non-administrative by primarily consisting of customer service and inside sales. In opposition, the Defendants argue that Mertes' primary duties consisted of office or nonmanual work.

The Plaintiffs offer Mertes' affidavit (dkt. # 49, ex. f) and an appointment book (dkt. # 49, ex. g) to show that Mertes' primary duty required her to devote over fifty percent of her time to non-administrative work, particularly inside sales and customer service. Mertes' affidavit states that her inside sales appointments, work in the camera room and framing orders were recorded in a daily appointment book. (Dkt. # 49, Ex. F, ¶¶ 2–5.) The sales appointments typically involved Mertes showing customers the photos that were taken, consulting with customers about the background and clothing and helping customers select frames. (Dkt.# 44, Ex. H, pp. 88–90.) Mertes claims that a review of the appointment book shows that she worked 952 hours in sales appointments, 160 hours in the camera room, and spent twenty-four hours framing orders. (Dkt. # 49, Ex. F, ¶ 6.) In total, Mertes claims to have worked 1,196.75 hours completing these customer service and inside sales tasks. (Dkt. # 49, p. 2.) Accordingly, given that Mertes worked a total of 2,496 hours over the fourteen months that she was employed by the Defendants, 47.9% of the time was devoted to inside sales, the

camera room and framing. (*Id.*) As to the remainder of her day, Mertes claims it was spent addressing customer issues such as answering phones, making appointments, taking payments from customers, calling customers when orders were ready, packaging customer orders, attending to walk in customers, cleaning, and opening and closing the store. (Dkt. # 49, Ex. F, ¶ 9.)

To dispute the Plaintiffs contentions of Mertes duties, the Defendants offer Liz's affidavit. (Dkt. # 44, Ex. E, ¶ 6.) The affidavit states that Mertes' primary duties were: (1) ensuring the orderly day-to-day operations of the studio; (2) supervising employees; (3) addressing customer issues; (4) resolving employee issues; (5) marketing the studio to current and prospective customers; (6) developing pricing structures; (7) interviewing prospective employees and being involved in the hiring process; (8) adjusting workflow on the basis of need (9) setting and recommending hours of employment; (10) exercising input in employee evaluations; (11) recommending employee discipline; (12) planning the studio's work on a day-to-day basis; (13) developing and suggesting potential business platforms and strategies; (14) negotiating and executing contracts; (15) recommending changes to the studio's appearance; (16) distributing work to others; (17) selecting advertising possibilities; (18) deciding on the studio's specials for the month; (19) conducting staff meetings; (20) developing promotional pamphlets; (21) procuring the studio's inventory; (22) determining who would be the studio's preferred vendors; (23) attending trade shows; (24) modifying the studio's appearance; (25) deciding to issue gift certificates to certain preferred customers; (26) deciding to give discounts or refunds to customers; and (27) meeting with production companies and media buyers. (*Id.*) In addition, Liz's affidavit states that Mertes dedicated eighty-five to ninety percent of her time to these duties and that she was hired as a manager. (*Id.* at ¶ 4, 7.) The Defendants claim that Mertes' responsibilities falls squarely within the service definition where one's work involves "advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." 29 C.F.R. § 541.205(b)

Prior to this analysis, the Court notes that, as the motion for summary judgment was brought by the Plaintiffs, the Court must decide whether the Defendants have submitted sufficient evidence to demonstrate that Mertes was an exempt "administrative" employee to create a genuine issue of material fact. *See Viola v. Rockingham Co-op. Farm Bureau, Inc.,* No. Civ.A. 5:01 CV 00068(APW), 2002 WL 467143, at *2 (W.D.Va. March 26, 2002) (finding that the defendant had "produced sufficient evidence demonstrating that [the plaintiff] was an exempt "administrative" employee to create a genuine issue of material fact."). Given the conflicting nature of the parties affidavits, along with the inconclusive nature of the record, the Court is prevented from granting the Plaintiffs' motion for summary judgment. The Court makes the following findings.

First, it is unclear if Mertes was engaged in administrative work. Whereas Mertes states that she primarily worked in non-administrative duties like customer service and inside sales (dkt. # 41, pt. a, ex. B, ¶¶ 3–4.), the Defendants contradict this assertion by stating that Mertes engaged in twenty-seven duties that were administrative or managerial in nature (dkt. # 44, ex. e, ¶¶ 7–8).

Second, as the Court is unable to determine whether Mertes engaged in administrative work, it logically follows that it cannot conclude whether her primary duties were administrative. The Plaintiffs claim that ninety percent of Mertes work encompassed customer service and inside

sales while the remaining ten percent of the time she worked on photography projects. (Dkt. # 41, Pt. A, Ex. B, ¶¶ 3–4.) The Defendants disagree stating that eighty-five to ninety percent of Mertes' time was dedicated to the twenty-seven administrative duties already mentioned. (Dkt. # 44, Ex. E, ¶¶ 7–8). While time alone is not the sole test of one's primary duties, *See Donovan*, 675 F.2d at 521, the discrepancy in this case is so significant that the issue weighs quite heavily. The submissions of both the parties lack pertinent facts to help the Court make the timing determination. In regards to the Defendants' submissions, there is no factual support for the contention that eighty-five to ninety percent of Mertes' time was dedicated to the twenty-seven administrative duties listed. The Defendants' submissions also fail to apprise the Court of the duty that they considered to be the "principal value" to Milardo Photo. *See Dalheim*, 918 F.2d at 1227. In regards to the Plaintiffs' submissions, the Court does not find the appointment book to be as compelling a piece of evidence as the Plaintiffs find it to be. The appointment book contains one and a half years of appointments where customers names were scheduled into time blocks. The Plaintiffs argue that "[t]hese documents show that Mertes spent most of her time engaged in inside sales and customer service" and that "[it] clearly documents the time spent by Mertes in actual inside sales appointments ...." (Dkt. # 49, p. 2.) Merely because the appointment book contains names does not mean that Mertes' duties with each customer was solely sales based.

Further, the Court cannot conclude what Mertes primary duties were because it is not convinced that Mertes' label of her duties as "inside sales," and therefore non-administrative, is accurate. Indeed, a jury could find that Mertes' duties with these customers was a more administrative one,

like promoting sales or control. *See* 29 C.F.R. 541.205(b).

The Court also cannot reach the primary duty decision because of the disputes surrounding whether Mertes was hired as a manager and supervised Asp. Mertes claims that she "performed few if any managerial duties" (dkt. # 41, pt. a, ex. b, ¶ 5), whereas Liz asserts that Mertes was specifically hired as a manager, (dkt. # 44, ex. e, ¶¶ 2–4). Similarly, Mertes states that she "did not supervise ... Asp, who reported directly to [Ted] and [Liz] Milardo," and that she "spent almost no time directing the work of the part-time employees." (Dkt. # 41, Pt. A, Ex. B, ¶ 5.) The Defendants counter that Mertes was Asp's supervisor because Mertes directed work to Asp regarding marketing ideas that would promote the studio. (Dkt. # 44, Ex. E, ¶ 11.)

Third, given the inability of the Court to decide the two prior issues, it logically follows that it cannot conclude whether her work was directly related to Milardo Photo's business operations. In other words, a Court cannot make the determination that the employees work is of "substantial importance to the management or operation of a business," *see* 29 C.F.R. § 541.205(c)(1), if it is unable to decide that her primary duties were administrative in nature.

Fourth, material facts are in dispute as to whether Mertes exercised discretion and independent judgment. As noted in primary duty section of the analysis, the submissions and arguments of the parties dispute two key issues regarding discretion, whether Mertes was hired as a manager and whether she supervised Asp.

In light of these disputes the Court is unable to determine the responsibilities that Mertes held at Milardo Photo and therefore can not conclude, as a matter of law, that she has proven that she engaged

in a non-administrative position.[5] *See Alberti v. County of Nassau*, 393 F.Supp.2d 151, 174 (E.D.N.Y.2005) (noting that "it is a strict question of law whether the activities and responsibilities of the employee, once established, exempt him or her from the FLSA's overtime requirements."). **Accordingly, the Plaintiffs' motion for summary judgment (dkt. # 41) as to Mertes being a non-administrative employee entitled to overtime compensation under the FLSA is DENIED.**

### b. The Professional Exemption Under FLSA

■ An employee may be covered by the professional exemption if they are either a "learned" or "artistic" type. *Dalheim v. KDFW–TV*, 706 F.Supp. 493, 501 (N.D.Tex.1988), *aff'd*, 918 F.2d 1220 (5th Cir.1990). Pursuant to the DOL "short test," an employee is an "artistic professional" employee if her:

> primary duty consists of the performance ... of work requiring invention, imagination, or talent in a recognized field of artistic endeavor, shall be

deemed to [be an employee employed in a bona fide professional capacity].

29 C.F.R. § 541.3(e).[6] In addition, a "professional" employee must also exhibit the exercise of "discretion and independent judgment." *See Kahn v. Superior Chicken & Ribs, Inc.*, 331 F.Supp.2d 115, 118 (E.D.N.Y.2004). Thus, Asp is an "artistic professional" employee if her: (1) "primary duty" consisted of work that required invention, imagination or talent in the field of photography, and (2) responsibilities also included work requiring the consistent exercise of discretion and independent judgment. *See* 29 C.F.R. § 541.3(e); *see also Kahn*, 331 F.Supp.2d at 118.

■ Under the FLSA, an employee works in a "professional" capacity if he or she possesses knowledge, in a field of science or learning, of an advanced type that is not attainable at the high school level, and is usually acquired by a prolonged course of specialized intellectual instruction and study. *Alberti*, 393 F.Supp.2d at 174 (citing *Tomney v. Int'l Ctr. for the*

**5.** Included in the Defendants' exhibits in opposition to the Plaintiffs' motion for summary judgment is the prejudgment remedy decision rendered by Judge Aurigemma of the Connecticut Superior Court, *Mertes v. Milardo Photography*, No. PJRCV030101233S, 2003 WL 22205981 (Conn.Super.Sept. 10, 2003). After a hearing was held, the court found, inter alia, that Mertes fell within the administrative exemption because she was the manager of Milardo Photo, identified herself as manager, ran the studio, supervised other employees and had the discretion to decide which orders should be rushed and whether or not to charge for certain work. *Id.* at *1–4. The court also found that Asp fell within the professional exemption because 80% of her time was devoted to artistic professional work and that she regularly exercised discretion and judgment in the performance of her work. *Id.* at *5.

This Court is neither inclined nor required to make the same determinative findings as

the Superior Court. The Court is not inclined to make the same determinative findings because there is no guaranty that the records before the courts are the same and because this Court, unlike the Superior Court, has not held a hearing to resolve the factual disputes and make determinations of credibility. The Court is not required to make the same determinative findings because this decision concerns a motion for summary judgment and not a prejudgment remedy. As the motion for summary judgment was filed by the Plaintiffs, the Court need not reach determinative conclusions as to the Defendants' assertions. Rather, given the summary judgment standard, it is enough that the Court find that the submissions of the Defendant raise genuine issues of material fact such that the Plaintiffs' motion can not be granted.

**6.** As in the preceding section, these regulations were in effect at the time of commencement of this lawsuit and remain the operative regulations for this action.

*Disabled,* 357 F.Supp.2d 721, 739–40 (S.D.N.Y.2005)). This knowledge is typically symbolized by an academic degree, preferably an advanced degree. *Id.* Again, the Court recognizes that exemptions to the FLSA are narrowly construed against the employer and the burden of establishing their applicability is upon the employer. *Moreau v. Klevenhagen,* 508 U.S. 22, 32, 113 S.Ct. 1905, 123 L.Ed.2d 584 (1993); *Malcolm Pirnie, Inc.,* 949 F.2d at 614 (noting that "because the FLSA is a remedial act, its exemptions ... are to be narrowly construed" and an employer must overcome a "presumption" of non-exemption).

In this case, the Defendants argue that Asp qualifies as an "artistic professional" because she was hired for the purpose of running a custom portrait studio with evolving technology. (Dkt. # 44, p. 19.) In March of 2002, Milardo Photo sought to make the transition from a film studio to a digital studio. (*Id.*) In doing so, the Defendants purchased new equipment and began to search for an employee who was an artist capable of working with new technology. (*Id.*) Asp, whose initial duties at Milardo Photo were limited to customer service, expressed an interest in the position. (*Id.*) The Defendants, noting that Asp had an art degree, a photography and arts background, an understanding of Adobe Photoshop, and an impressive portrait portfolio, decided to promote her to the new position. (*Id.*)

The Plaintiffs claim that Asp does not qualify under the "artistic professional" exemption because the vast majority of her time was spent retouching and printing the digital photographs taken by Ted. (Dkt. # 41, Pt. A, p. 11.) In addition, the Plaintiffs note that Asp's use of Adobe Photoshop was to retouch photographs by removing blemishes and misplaced hairs. (*Id.*) In support of their claims the Plaintiffs rely on *Reich v. Newspapers of New Eng-*

*land, Inc.,* 44 F.3d 1060, 1075 (1st Cir. 1995). In *Reich,* the First Circuit held that two news photographers were not professionals exempt from overtime provision of FLSA. *Id.* at 1078. There, the court determined that one photographer shot film of sporting events and police radio incidents. *Id.* at 1066. The other photographer shot film of sporting events, pet of the week, buildings, and meetings while spending significant time in the darkroom developing the pictures. *Id.*

Here, in contrast to the facts concerning the photographers in *Reich,* the record depicts creativity and talent on the part of Asp. In his affidavit, Ted points out that the creativity utilized by Asp was employed before, during and after the photo shoot. (Dkt. # 44, p. 20.) Prior to photographing a client Asp visualized the final portrait. (*Id.*) Next, Asp would create a scene using the appropriate background. (*Id.*) Finally, Asp would then make lighting adjustments, place the client in a pose, and adjust the client's composition in preparation or during the photos, which were taken by Asp or Ted. (*Id.*) Fifteen to twenty percent of Asp's time was dedicated to the photography duties. (*Id.*) Once the hundred or more photos were taken, Asp would choose the final picture and use the Adobe Photoshop to employ image enhancement, manipulation and editing. (*Id.* at 21.) These post-photography activities encompassed seventy to seventy-five percent of the time. (*Id.*)

The Plaintiffs argue that there is no support in the record for the conclusions contained within Ted's affidavit. In fact, Ted's testified in a deposition two times that he was unsure how much time Asp spent retouching senior photographs. (Dkt. # 49, Ex. J, pp. 76–77.) The Court does not believe that this renders Ted's affidavit valueless. Certainly, Ted's role as co-owner and photographer at Milardo

Photo afforded him the opportunity to oversee Asp's performance and provide an accurate depiction of the percentage of her duties.

Next, the Plaintiffs contend that Asp performed certain work that was labeled "Special Artistry" and that this is the only work that should be considered under the "artistic professional" exemption. (Dkt. # 49, p. 3.) Through invoices issued to various patrons, Milardo Photo would include an extra charge for "Special Artistry." (*Id.*) The Plaintiffs argue that this charge was only included on 5.3% of the images and therefore could not constitute the primary duty of Asp. (*Id.*) In fact, the primary duty was high school senior photos on which no "Special Artistry" occurred. (*Id.* at p. 4.) The Defendants dispute this assertion by arguing that "Special Artistry" was merely a charge that was included on projects done by Asp that took extra time to create. (Dkt. # 52, p. 5.) Moreover, the "Special Artistry" platform dealt with children's photography, to which Asp's work was not typically related. (*Id.*)

 Similar to the analysis of Mertes, there are a great deal of facts in dispute that prevent the Court from granting the Plaintiffs' motion for summary judgment. Parts of Asp's background, like her art degree, knowledge of Photoshop and the creation of the portrait scene, are artistic in nature. This does not mean, however, that she qualifies as primarily doing professional work because it is unclear if this training would be considered a "prolonged course of specialized intellectual instruction." *See Alberti*, 393 F.Supp.2d at 174. Also, the professional exemption typically requires an advanced degree, which Asp does not possess. Whether an advanced degree for this field of work exists, and more so, whether it is needed, is not clear. In addition, the record fails to clarify whether (1) these duties constituted Asp's

primary work at Milardo Photo, (2) her other duties were artistic and professional in nature, and (3) she exhibited discretion and independent judgment. To evaluate these facts and answer these questions is the job of the jury. **Accordingly, the Plaintiffs' motion for summary judgment (dkt. # 41) as to Asp being a non-professional employee entitled to overtime compensation under the FLSA is DENIED.**

### 2. Overtime Under CMWA

The Plaintiffs argue that they are entitled to unpaid overtime wages under the CMWA, Conn. Gen.Stat. §§ 31–58, *et seq.* The Defendants contend that both Plaintiffs are exempt from overtime wages, Mertes because she is an "administrative" or "executive" employee and Asp because she is an "artistic professional" employee. The CMWA provides wage and overtime guarantees similar to the FLSA and also exempts certain employees from its requirements. *Scott v. Aetna Servs.*, 210 F.R.D. 261, 263 n. 2 (D.Conn.2002).

#### i. The Administrative Exemption Under CMWA

 The overtime pay provisions of the CMWA do not apply with respect to any person employed in a bona fide "administrative" capacity, as defined by the State of Connecticut, Department of Labor regulations. Conn. Gen.Stat. § 31–76i(e). The regulation in place at the time of filing this action states that the "administrative" exemption is met when:

> an employee who is compensated on a salary or fee basis at a rate of not less than four hundred seventy-five dollars per week, exclusive of board, lodging, or other facilities, and whose primary duty consists of the performance of [office or nonmanual work directly related to management policies or general business operations of his employer or his em-

ployer's customers], which includes work requiring the exercise of discretion and independent judgment, shall be deemed to [be a bona fide an employee employed in a bona fide administrative capacity]. *See* Conn. Agencies Regs. § 31–60–15(a). The primary factor in the determination of whether a person is employed in a bona fide administrative capacity, and thus exempt from overtime compensation, is the nature of his or her duties. *Butler ex rel. Skidmore v. Hartford Tech. Inst.,* 243 Conn. 454, 467, 704 A.2d 222 (1997). The same analysis conducted under the FLSA applies here. As the Court is unable to determine the primary duties of Mertes, it cannot grant summary judgment. **Therefore, the Plaintiffs' motion for summary judgment (dkt. # 41) as to Mertes being a non-administrative employee entitled to overtime compensation under the CMWA is DENIED.**

### ii. The "Executive" Exemption Under CMWA

■ The overtime pay provisions of the CMWA do not apply with respect to any person employed in a bona fide "executive" capacity, as defined by the State of Connecticut, Department of Labor regulations. Conn. Gen.Stat. § 31–76i(e). The regulation in place at the time of filing this action states that the "executive" exemption is met when:

An employee who is compensated on a salary basis at a rate of not less than $475 per week, exclusive of board, lodging, or other facilities, and whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein, shall be deemed to [be an employee employed in a bona fide executive capacity].

*See* Conn. Agencies Regs. § 31–60–14(a). In regards to the supervision of two or more employees, the payroll records demonstrate that Mertes directed two or more employees for thirty-nine of the sixty-one weeks that she was employed at Milardo Photo, or as the Defendants argue, sixty-four percent of the time. Whether sixty-four percent of the time qualifies as "customary and regular" is difficult to determine because the CDOL has not provided the Court with guidance on this issue. Further, even assuming the sixty-four percent constitutes "customary and regular," this would mean that Mertes duties during these thirty-nine weeks was devoted solely to direction and supervision. As explained before, and indicated in the record, Mertes engaged in non-managerial duties during this time. Further, there are genuine issues of material fact regarding whether Mertes was hired as a manager (dkt. # 41, pt. a, ex. b, ¶ 5; dkt. # 44, ex. e, ¶¶ 2–4) and whether she supervised Asp (dkt. # 41, pt. a, ex. b, ¶ 5; dkt. # 44, ex. e, ¶ 11). **Accordingly, the Plaintiffs' motion for summary judgment (dkt.# 41) as to Mertes being a non-executive employee entitled to overtime compensation under the CMWA is DENIED.**

### iii. The "Professional" Exemption Under CMWA

The overtime pay provisions of the CMWA do not apply with respect to any person employed in a bona fide "professional" capacity, as defined by the State of Connecticut, Department of Labor regulations. Conn. Gen.Stat. § 31–76i(e). The regulation in place at the time of filing this action states that the "professional" exemption is met when:

An employee who is compensated on salary or fee basis at a rate of not less than $475 per week exclusive of board, lodging, or other facilities, and whose primary duty consists of the performance

ance of work requiring invention, imagination or talent in a recognized field of artistic endeavor, shall be deemed to [be an employee employed in a bona fide professional capacity.]

*See* Conn. Agencies Regs. § 31–60–16(a). Where an employee's compensation is below $475 but above $425 per week, the exemption is available where:

1. The primary duty consists of the performance of work that is original and creative in character in a recognized field of artistic endeavor, as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training and the result of which depends primarily on the invention, imagination or talent of the employee.

2. Whose work requires the consistent exercise of discretion and judgment in its performance.

3. Whose work is predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical or physical work, and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; and

4. Who does not devote more than twenty per cent of his hours worked in the workweek to activities which are not an essential part of and necessarily incident to the work described in subdivisions.

*Id.* The criteria for employees over $475 is referred to as the professional exemption "short test." Those for employees who earn between $425 and $475 is known as the professional exemption "long test."

Here, the "long test" and the "short test" apply. From March 18, 20012 until May 6, 2001, Asp was compensated at $440 per week, meaning the "long" test applies. From May 6, 2001 until she left Milardo Photo, Asp was compensated at $500 per week, meaning the "short" test applies. Here again summary judgment can not be granted because of the discrepancy in Asp's duties. The Plaintiffs argue that most of Asp's work was the retouching and printing of digital photographs (dkt. # 49, p. 7) while the Defendants claim that Asp's work was creative in character and required her to use a wide variety of artistic talents to make a piece of art (dkt. # 44, p. 28). Thus, since the Court is unable to determine whether Asp satisfied the "long test," it follows that it cannot determine whether Asp satisfied the "short test." **Accordingly, genuine issues of material fact exist such that the Plaintiffs' motion for summary judgment (dkt. # 41) as to Asp's claim that she is a non-professional employee entitled to overtime compensation under the CMWA is DENIED. As summary judgment is denied the Court need not address the issue of damages.**

### 3. Statute of Limitations Under FLSA and CMWA

The Plaintiffs seek a determination that the statute of limitations defense pled by the Defendants in their answer be rejected by the Court. The Defendants argue that because the action was filed on June 22, 2004, the two year limitations period under the FLSA and CMWA requires that all claims prior to June 22, 2002 be barred. The Plaintiffs argue that the two year period should be tolled because the Defendants failed to post wage and hour posters.

The statute of limitations for violation of the FLSA and CMWA is two years after the cause of action has commenced. 29 U.S.C. § 255(a); Conn. Gen.Stat. § 52–596. Here, the cause of action commenced on June 22, 2004, so all claims prior to June 22, 2002, are barred unless they can be tolled. Employees may toll their unpaid overtime claims through a statutory or equitable toll.

### i. Statutory Tolling Under CMWA and FLSA

The CMWA statutory toll increases the limitations period to three years if the plaintiff has filed a complaint for failure to pay wages with the Labor Commissioner, *see* Conn. Gen.Stat. § 52–596, whereas the FLSA statutory toll increases the limitations period to three years for a "willful violation," *Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1061 (2d Cir.1988). Here, the Defendants argue that there is no evidence that the Plaintiffs filed a complaint with the CDOL prior to commencing this lawsuit. The Court agrees. **Accordingly, the Court can not reject the Defendants statute of limitations defense as to the CMWA claims on the basis of a statutory toll.**

Next, the Court examines whether the Defendants have created a genuine issue of material fact with respect to the statutory toll under FLSA. To establish a tolling period under FLSA a plaintiff must show two things. *See McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 136, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). First, the employee must show that the employer engaged in conduct that is prohibited by statute. *Id.* Here, the Plaintiffs claim that the fact[7] that the Defendants' failed to post wage and hour posters constitutes conduct that is prohibited by statute. The Court agrees that the Defendants engaged in statutorily prohibited behavior because the FLSA requires that every employer post a notice explaining the act, regardless of whether the employees are subject to minimum wages. *See* 29 C.F.R. § 516.4 ("Every employer employing any employees subject to the Act's minimum wage provisions shall post and keep posted a notice explaining the Act .... [a]ny employer of employees to whom section 7 of

the Act does not apply because of an exemption of broad application to an establishment may alter or modify the poster with a legible notation to show that the overtime provisions do not apply."). Second, establishing the tolling period under the FLSA requires the employee to show that the employer "willfully violated" the statute by "[knowing] or show[ing] reckless disregard for the matter of whether its conduct was prohibited by the statute...." *McLaughlin,* 486 U.S. at 133, 108 S.Ct. 1677.

█ In this case, the record reveals that Liz had extensive experience in wage and hour law. Specifically, Liz admits to having: (1) prior experience with wage and hour law, (2) taking classes on how to categorize employees for the purpose of wage and hour law, (3) reviewing brochures published by the CDOL on wage and hour law, (4) speaking with the Commissioner of the CDOL to discuss employee classifications, and (5) "sp[eaking] with the [CUCC] regarding any potential overtime issues that might have arisen by virtue of Milardo Photography's decision to classify Lisa Asp and Paulette Mertes as salaried exempt employees." (Dkt. # 44, Ex. E, ¶¶ 37–41.) Furthermore, the Defendants admit that they failed to post the FLSA notice, (dkt. # 45, ¶ 8), and also have not submitted any evidence to indicate that they did not know or disregard the posting requirement, no genuine issue of material fact has been raised. Whereas the evidence provided by the Plaintiffs shows that Liz likely knew of her posting obligation and failed to fulfill it, a genuine issue of material fact remains as to whether the Defendants knowingly or recklessly disregarded this obligation. **Accordingly, Court can not reject the Defendants statute of limitations defense as to the FLSA claims on the basis of a statutory toll.**

---

7. It is undisputed that the Defendants failed to post the posters. (Dkt. # 45, ¶ 8.)

### ii. Equitable Tolling

In addition to the statutory toll, a court can toll the statute of limitation to avoid inequitable circumstances. *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir.1996); *see also Ellis v. General Motors Acceptance Corp.*, 160 F.3d 703, 706 (11th Cir. 1998) (unless explicitly stated otherwise by statute, equitable tolling should be "read into every federal statute of limitations."); *Holmberg v. Armbrecht*, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946) (noting that the doctrine of equitable tolling has also been applied where the pertinent statute of limitations was a state statute).

 Equitable tolling allows courts to extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances. *Bowers v. Transportacion Maritima Mexicana, S.A.*, 901 F.2d 258, 264 (2d Cir.1990); *see also Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 (2d Cir.1993) (equitable tolling will stay running of statutory period "only so long as the plaintiff has exercised reasonable care and diligence" (internal quotation marks omitted)), *cert. denied*, 511 U.S. 1019, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994); *Transportacion Maritima Mexicana*, 901 F.2d at 264 (equitable tolling not satisfied in the absence of "affirmative action on the part of [plaintiff] to preserve its right"); *accord Singletary v. Continental Illinois Nat'l Bank & Trust Co.*, 9 F.3d 1236, 1241 (7th Cir.1993) (equitable tolling "permits a plaintiff to sue after the statute of limitations has expired if through no fault or lack of diligence on his part he was unable to sue before"). Courts have applied the doctrine "as a matter of fairness" where a plaintiff has been "prevented in some extraordinary way from exercising his rights, or h[as] asserted his rights in the wrong forum." *Miller v. International Tel. & Tel. Corp.*, 755 F.2d 20, 24 (2d

Cir.1985), *cert. denied*, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985). Courts have allowed equitable tolling if the plaintiff asserted his or her rights in the wrong forum or if some extraordinary circumstance has prevented the plaintiff from exercising his or her rights. *Id.* An extraordinary circumstance might exist if the employee shows that it would have been impossible for a reasonably prudent person to learn of the cause of action, *See Int'l Tel. and Tel. Corp.*, 755 F.2d at 24, or if the defendant concealed from the plaintiff the existence of the cause of action, *Gustafson v. Bell Atlantic Corp.*, 171 F.Supp.2d 311, 323 (S.D.N.Y.2001) (explaining that statute of limitations begins to run when the plaintiff either acquires actual knowledge of facts comprising his claim or should have acquired such knowledge through reasonable diligence) (citing *Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 48 (2d Cir.1985)).

Here, the Plaintiffs argue that the statute of limitations defense should be rejected because the Defendants failed to post wage and hour posters in violation of 29 C.F.R. § 516.4. Accordingly, the issue before the Court is whether the failure to post wage and hour posters constitutes an extraordinary circumstance such that the Plaintiffs were prevented from exercising their rights under the FLSA and CMWA.

Whereas a few courts have decisively held that the failure to post the FLSA notice is not grounds to equitably toll the statute of limitations, *see e.g., Immacula Antenor v. D & S Farms*, 39 F.Supp.2d 1372, 1380 (S.D.Fla.1999) (holding that because the FLSA poster required by 29 C.F.R. § 516.4 makes no mention of the applicable two-year statute of limitations, failure to post it does not toll the statute of limitations); *Archer v. Sullivan County, Tenn.*, Nos. 95–5214/95–5215, 1997 WL 720406, at *4–5, 1997 U.S.App. LEXIS 33052, at *13–14 (6th Cir.1997) (holding

that employer's failure to provide required Department of Labor notice of employee's rights under FLSA does not alone provide a basis for equitable tolling), these decisions seem to be the minority opinion. Instead, the trend regarding the failure to post FLSA notices is more flexible and permits equitable tolling where the plaintiff did not consult with counsel during his employment and the employer's failure to post notice is not in dispute. *Patraker v. Council on Environment of New York City*, No. 02 Civ. 7382(LAK), 2003 WL 22703522, at *2 (S.D.N.Y. Nov. 17, 2003) (finding that the failure to post notice might have resulted in equitable tolling but for the retention of an attorney regarding a proposed employment contract that included compensation figures); *Baba v. Grand Central P'shp.*, No. 99 CIV. 5818(TPG), 2000 WL 1808971, at *2 (S.D.N.Y. Dec. 8, 2000) (denying the defendants' motion for summary judgment based on the FLSA statute of limitations because the parties disputed whether notice had been adequately posted such that it was unclear whether the employee had actual notice of his rights); *Veerkamp v. U.S. Security Associates, Inc.*, No. 1:04–cv-0049 (DFH)(TAB), 2006 WL 2850020, at *6 (S.D.Ind. Sept. 29, 2006) (finding that the plaintiffs failed to prove a theory of equitable tolling because the evidence showed that the employees had received written manuals regarding overtime pay and minimum wage and that the poster was displayed at the defendant's headquarters where applicants for jobs appeared in person); *Hann v. Crawford & Co.*, No. Civ.A. 00–1908(DWA), 2005 WL 2334676, at *5 (W.D.Pa. Aug. 9, 2005) (citing, *Bonham v. Dresser Industries, Inc.*, 569 F.2d 187, 193 (3d Cir.1977)) ("The failure to post a required notice will toll the running of the limitations period, 'at least until such time as the aggrieved person seeks out an attorney or acquires actual knowledge of his rights under' the Act."); *Cisneros v. Jinny Beauty Supply Co., Inc.*, No. 03 C 1453, 2004 WL 524482, at *1 (N.D.Ill. Feb. 6, 2004) ("[A]n employer's failure to post the notice required by 29 C.F.R. § 516.4 tolls the FLSA statute of limitations until an employee acquires a general awareness of his rights under the FLSA."); *Henchy v. City of Absecon*, 148 F.Supp.2d 435, 439 (D.N.J.2001) (finding that the plaintiff had raised a genuine issue of material fact with respect to equitable tolling where the employer repeatedly assured the plaintiff that the overtime compensation provided was proper and the employer failed to post a notice informing employees of their minimum wage and overtime pay rights).

In this case, there is no evidence that either Asp or Mertes consulted with counsel during their employment at Milardo Photo. It is also an undisputed fact that the Defendants failed to post the FLSA notice. (Dkt. # 45, ¶ 8.) Finally, there is no evidence to show that the Plaintiffs had any knowledge, actual or constructive, of their rights regarding overtime compensation. In fact, even the Defendants acknowledge that the Plaintiffs were ignorant of their right to overtime compensation: "[The Plaintiffs] never asked about their exempt status, nor did they demand overtime compensation from Milardo Photography during their employment for Milardo Photography." (Dkt. # 44, Ex. E, ¶ 43.) The Plaintiffs should not be penalized for not being aware of a right that they had no means of knowing. **Accordingly, the Court rejects the Defendants statute of limitations defense because the Plaintiffs are entitled to the equitable tolling of their FLSA and CMWA claims.**

### 4. Liquidated Damages, Double Damages and Attorney's Fees

In their motion for summary judgment the Plaintiffs argue that they are entitled

to liquidated damages, double damages and attorney's fees. **As the motion has been denied, the Court need not address the merit of these arguments.**

## C. THE DEFENDANTS CLAIMS— THEFT OF CUSTOMER LISTS

In their Counterclaims, the Defendants argue that the Plaintiffs misappropriated their customer list in order to open their own photography studio called Studio 970. The Plaintiffs contend that they did not steal the list, they do not possess the list and there is no evidence that they stole or possess the list. Accordingly, the Plaintiffs argue that the Defendants' Counterclaims counts five through twelve should be dismissed because there is no evidence to support the proposition that a theft of their computer system, database or customer list occurred. In support of their argument the Plaintiffs note that at Liz's deposition she admitted that there was no evidence, other than speculation, to prove Asp burned a CD with a P6 folder. In response, the Defendants claim that this admission was an "isolated statement" (dkt. # 44, p. 35) and that the following evidence raises triable issues for the claims relating to the theft.

First, the Defendants argue that the Plaintiffs opened their own competing photography studio, the process of which began prior to the Defendants accusation of stolen customer and financial information. The Defendants make this claim to show that it is indisputable that the Plaintiffs would benefit from the theft of Milardo Photo's information.

Second, the Defendants argue that on February 9, 2003, a back up of the Defendants' database was downloaded from Milardo Photo's main computer to the computer normally used by Asp. At this time, Asp was working at Milardo Photo while the Defendants were at their daughter's soccer game. The database contained key marketing information including information on customers and their purchases, orders and other things. Records of Asp's computer show that the Photo One P6 folder was backed up on February 9, 2003.[8] The Defendants argue that there was no reason for this information to be on Asp's computer. The Defendants claim that Asp burned this information onto a CD for portability purposes. Although Asp denied burning a copy of the information onto a CD, she admits to backing up the Photo One but, states that she did this because she was told to do so by Ted.

Third, on April 14, 2003, Milardo Photo's Granite Bear software customer number and password were utilized. Granite Bear issues a customer number and password to download demo versions of its software. Granite Bear has confirmed that numerous attempts to access the account were made from outside Milardo Photo. On this day Ted and Liz were on vacation and did not utilize the Granite Bear password. The Plaintiffs, however, had access to Milardo Photo's Granite Bear password and the Defendants claim the Plaintiffs attempted to access their account to download a Photo One demo version. The reason for this attempt, the Defendants claim, would be to enable the Plaintiffs to read Milardo Photo's customer information, which they had previously stolen when they alleged burned the information onto a CD.

· Fourth, the Plaintiffs contacted two of Milardo Photo's customers and also used the names and addresses of out-of-state customers to support their FLSA jurisdic-

---

**8.** Photo One is a studio management software program produced by a company called Granite Bear Development. Photo One allows an owner to maintain and track impor-

tant customer and financial information. Prior to February 9, the customer and financial information had never been downloaded onto Asp's computer.

tional claims during their application for a prejudgment remedy in the Superior Court of Connecticut. Even though no discovery had been conducted, the Plaintiffs identified customers names and addresses. The Plaintiffs also sought information on these customers regarding whether they paid for orders.

 The Defendants have set forth circumstantial evidence that overcomes the answer that Liz provided in her deposition. To avoid granting summary judgment in the context of theft, the Court must find an undisputed fact that could reasonably infer that the alleged act occurred. *See* *Warren v. Williams*, No. 3:04–cv–537 (JCH), 2006 WL 860998, at *23–24, 2006 U.S. Dist. LEXIS 18900, at *73 (D.Conn. Mar. 31, 2006) (finding that because defendants were the last people in control of an address book, there is a reasonable inference that the defendants seized the address book such that summary judgment must be denied.) In this case, the Court finds that two of the four arguments set forth by the Defendants reasonably infer that the misappropriation occurred: (1) on February 9, 2003, a back up of the Defendants' database was downloaded from Milardo Photo's main computer to Asp's computer on a date when the Plaintiffs were working and the Defendants were away; and (2) on April 14, 2003, numerous attempts to access the Defendants' Granite Bear software account were made from outside Milardo Photo when the Defendants were on vacation and the Plaintiffs had the password. **Accordingly, the Plaintiffs' motion for summary judgment (dkt. # 41) as to the Defendants' Counterclaims counts five through twelve is DENIED.**

### III. CONCLUSION

For the foregoing reasons the Plaintiffs' motion for summary judgment (dkt. # 41) is DENIED. All of the Plaintiffs' claims and the Defendants' Counterclaims remain in this action.